STATE OF VERMONT, Village of Poultney

v.

STACO, INC., Chase Instruments Corporation, Chase Instruments Sales Corporation, Keeper Corporation, Robert Sirkus, I. Walter Munzer, Robert Munzer.

Civ. A. No. 86–190.

United States District Court, D. Vermont.

Jan. 6, 1988.

Mark DiStefano and Denise R. Johnson, Asst. Attys. Gen., Montpelier, Vt., for State of Vt.

Stephen A. Dardeck, Tepper & Dardeck, Rutland, Vt., for Village of Poultney.

John Webber, Hull, Webber & Reis, Rutland, Vt., Benjamin R. Pratt, Jr., Miller, Mannix, Lemery & Pratt, P.C., Glens Falls, N.Y., for defendants.

OPINION

HOLDEN, Senior District Judge.

The plaintiffs, State of Vermont and the Village of Poultney, Vermont, have invoked federal jurisdiction as granted to the district court by 28 U.S.C. § 1331, the Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 *et seq.* and the Resource Conservation and Recovery Act of 1976 as amended (RCRA), 42 U.S.C. § 6901, *et seq.* Pendent jurisdiction is asserted to adjudicate state claims under the provisions of the Vermont Waste Management Act, 10 V.S.A. § 6601, *et seq.* related Vermont statutory enactments, and the common law of nuisance. The main objective of the proceedings is to recover response costs incurred to date and achieve the cleanup and removal of mercury as a hazardous substance alleged to be contaminating the Poultney Sewage Treatment Facility, the connecting municipal sewer lines, and certain privately owned septic systems.

The source accused of the alleged contamination is the defendant Staco, Inc., a manufacturing company that formerly produced mercury thermometers at a plant in Poultney. The plant has been closed since June 1984. The other corporate defendants, Chase Instruments Corporation, Chase Instruments Sales Corporation and Keeper Corporation are joined as members of a family commercial enterprise that included the operation and ownership of the Staco site.

The individual defendants are charged as the principal executive officers of the related companies alleged to be responsible for the releases of mercury from the Staco–Chase plant and introduction of the substance into the public and private sewer facilities in Poultney. The defendants answered the complaint by denying generally the multiple claims and asserting seven affirmative defenses.

The case is presently before the court on the plaintiffs' motion for partial adjudication of the issue of liability and recovery of response costs, pursuant to Fed.R.Civ.P. 56. Before reaching the merits of the mo-

tion, the court is called upon to deal with a variety of discovery complications to settle the facts upon which the pending motion is founded. An additional aspect of the problem derives from state administrative proceedings and a state civil action which constitute extensive antecedent background to the instant federal suit.

### Jurisdiction

The jurisdictional base for the court's power to adjudicate the present controversy is well founded and pleaded by the state under 28 U.S.C. § 1331. *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 70, 98 S.Ct. 2620, 2628–29, 57 L.Ed.2d 595 (1978). Federal jurisdiction also has been predicated on other statutory provisions: 42 U.S.C. §§ 9607 (CERCLA) and 6972(a)(1)(B) (RCRA), as previously noted. Under the rubric of jurisdiction, the

1. The Court further ORDERS:

(1) That the defendants are in violation of 10 V.S.A. § 1259(a), Rule 13 of the Vermont Water Quality Standards and Regulations, and Article V, § 503 of the Ordinance Regulating the Use of Sewers in the Village of Poultney, Vermont. By the execution of the Stipulation, defendants do not admit that any violation of law was intentional or purposeful and the parties agree that defendants acted immediately to cease all violations when notified by plaintiffs of the pollution.

(2) That judgment be entered in favor of plaintiffs against all defendants, in the amount of $170,000.00, and for such further monies as may be reasonable and necessary to complete the clean-up plan specified in paragraph 5 herein. Said judgment shall be satisfied by complete compliance with paragraph 5 herein by the dates specified and by the filing of a certificate signed by the plaintiffs affirming compliance with said provision. Plaintiffs shall not unreasonably refuse to sign and file said certificate in a timely fashion. In the event that defendants do not complete the clean-up plan as provided in paragraph 5, plaintiffs may execute and/or foreclose on the judgment granted herein. Defendants are entitled to recover from plaintiffs the difference, if any, between the reasonable amounts expended by plaintiffs to complete the plan specified in paragraph 5 including the plaintiffs' costs and attorneys' fees on execution and/or foreclosure, and the $170,000.00 judgment. And difference shall be paid to defendants within 10 days from completion of the clean-up plan.

. . . . .

(5) That a permanent injunction shall enter ordering the defendants to decontaminate the

court's authority is questioned by the defendants' motion to dismiss on principles of *res judicata* and accord and satisfaction.

### Motion to Dismiss

■ The defendants maintain this action is barred by a stipulated judgment entered in the state superior court of Rutland County on September 28, 1984. The state action was initiated by the same plaintiffs against the same defendants here, except for Robert Munzer, who was added in the federal complaint.

The state judgment order, annexed by copy to the answer, opens with the recital that it is entered in favor of the plaintiffs "against all defendants, pursuant to 10 V.S.A. § 1274 and 3 V.S.A. § 2822 and the Ordinance Regulating the Use of Sewers in the Village of Poultney, Vermont."[1]

Poultney Waste Water Treatment Facility, the internal plumbing of the Staco/Chase plant, and all sewer lines leading from Staco to the Poultney Wastewater Treatment Facility, in accordance with the following procedures:

. . . . .

*State of Vermont et al. v. Staco, Inc. et al.*, No. S148–84, Judgment Order at 2–5 (Rutland Cty. Sup.Ct., Sept. 28, 1984).

Paragraph 5 of this Judgment Order sets forth a detailed plan, including deadlines, for cleaning Poultney's treatment facility, Staco's internal plumbing, and the intervening sewer lines. The order also provides:

6. That a permanent injunction shall enter enjoining the defendants from illegally discharging mercury to the Poultney Wastewater Treatment Facility or collection and treatment system.

7. That all parties to this Judgment Order reserve any and all rights to enforce and defend the terms of this Judgment Order, including the right to seek civil penalties and other damages in the event of violation, breach or noncompliance.

8. That time is of the essence with respect to all aspects of the clean-up plant [sic].

. . . . .

11. Upon completion of the clean-up plan provided in paragraph 5 and filing of the certificate of compliance by the plaintiffs, plaintiffs shall execute a release to all named defendants ... as to any and all liability for the allegations set forth in plaintiffs' complaint.

*Id.* at 11–13.

Plaintiffs, the State of Vermont and the Village of Poultney, have not filed the certificate of compliance because, they claim, defendants

It is at once apparent from the text of the state judgment, shown in the margin, that liability was premised entirely on defendants' violation of 10 V.S.A. § 1259(a).

This section of the Vermont Water Pollution Control Act prohibits "the discharge of any water substance or material into a public treatment facility which would have an adverse effect on the treatment works or water quality," without first obtaining a permit for that discharge from the secretary of the state agency of environmental control. The time period involved was prior to June 1984.

This federal action is differently constituted. It concerns subsequent violations of 10 V.S.A. § 1274. More importantly, this suit invokes pertinent provisions of federal and state environmental laws that were not available to the plaintiffs at the time the state consent decree was entered.

It will appear later in the discussion that the present federal suit is directed against mercury releases that are different in time, place and effect. According to the complaint, contamination of the Poultney Water Treatment Facility came from homes and domestic plumbing systems by migration of mercury carried on the bodies and personal effects of workers from the Staco plant.

The doctrine of *res judicata*, as recently explained by the state supreme court, applies "only if the parties, subject matter and causes of action are identical or substantially identical." *Berisha v. Hardy*, 144 Vt. 136, 138, 474 A.2d 90 (1984).

The state action was principally based on the release of mercury while the Staco plant was in production during 1973 to 1984. Contamination resulted from the presence of mercury in cleaning water that drained from the plant plumbing apparatus that connected into the municipal sewage system.

The present litigation is based on a release by drainage in the summer of 1985. It further involves the continuing exposure of the workers, while Staco/Chase was in production, and by contamination and carriage to the domestic environment of the plant employees.

In any event, any issues of fact and statutory law, common to the prior state litigation and the present federal action, are within the exceptions expressed in the Restatement, Second, Judgments § 86(1) and (2).

**Effect of State Court Judgment in a Subsequent Action in Federal Court**

A valid and final judgment of a state court has the same effects under the rules of res judicata in a subsequent action in a federal court that the judgment has by the law of the state in which the judgment was rendered, except that:

(1) An adjudication of a claim in a state court does not preclude litigation in a federal court of a related federal claim based on the same transaction if the federal claim arises under a scheme of federal remedies which contemplates that the federal claim may be asserted notwithstanding the adjudication in state court; and

(2) A determination of an issue by a state court does not preclude relitigation of that issue in federal court if according preclusive effect to the determination would be incompatible with a scheme of federal remedies which contemplates that the federal court may make an independent determination of the issue in question.

The defendants' motion to dismiss is denied.[2]

*Discovery Procedures*

■ Discovery in this action opened with interrogatories propounded to the plaintiff in late November 1986. A jointly proposed discovery schedule was approved by Chief

have not fulfilled the requirements of paragraph 5.

**2.** Defendants also argued in their motion to dismiss that plaintiffs were seeking to collaterally attack the prior state court judgment order.

In bringing suit in federal court alleging further releases of mercury, plaintiffs are not challenging the validity of the state court judgment on any basis. Thus the current action is not a collateral attack.

Judge Coffrin early in December. Following the agreement of defendants' counsel to grant the plaintiffs' request to extend the time to answer defendants' interrogatories, the court approved the further agreement of the parties to enlarge the time to add additional parties and file further pretrial motions. The stipulations were approved and so ordered by the court.

The State's answers to the interrogatories were served on April 1, 1987. On April 21 the plaintiffs' first requests to admit were served on all parties of record. On May 19, 1987 the court approved the stipulation of the parties to extend the time for completion of discovery to July 31, 1987. Notice of appearance of the first Vermont law firm as local counsel for all defendants was filed June 29, 1987.

The State, on July 10, 1987, undertook a second round of discovery and propounded a second set of requests to admit. No further discovery activity is recorded during the ensuing two months. On September 10, 1987 the court was notified of substitution of local counsel for the defendants.

The dormant record was soon awakened by a series of motions filed by the State on September 21st. They included the present motion for summary judgment on issues of the defendants' liability under selected state and federal statutes. The Rule 56 motion was accompanied by plaintiffs' statement of undisputed facts set forth in 107 separate paragraphs. Also included in the September 21 filing were copies of the plaintiffs' first and second sets of requests to admit. At this point in time, neither series of the State's request to admit had been answered by the defendants.

On October 23 the defendants moved to dismiss the complaint. This was followed by filing on October 26 the certificate of service of the answers to the plaintiffs' second requests for admission. On the same day the defendants moved, pursuant to Rule 36(a), to extend the time to respond to the plaintiffs' requests to admit, dated April 22 and July 10, 1987. The motion to extend time is based on the change in counsel referred to earlier and asserts: "Responses to the July Requests are filed herewith, and responses to the April set will be filed in the immediate future." [3]

Defendants' motion to extend the time for responding to the requests to admit has met strong resistance from the State in both written and oral arguments. At the close of hearings held on November 12, 1987, concerning the defendants' motion to dismiss and the State's motion for summary judgment, the court afforded the parties the opportunity to further address the application of Rule 36 to the pending motion for summary judgment.

The defendants have availed of the opportunity by filing the answers to the State's first request to admit. Further, over the State's objection, defendants have moved to allow the filing of additional affidavits in opposition to the State's motion for summary adjudication of liability.

The State has also moved to determine the sufficiency of the defendants' responses to the requests to admit and to strike the answers provided. The State seeks sanctions under Rule 37, Fed.R.Civ.P.

The most recent of the State's post hearing motions are thorough and searching. The motion to strike poses serious questions that go to the merits of the entire controversy and relate to mixed questions

---

**3.** Reference to the record does not support this assertion in defendants' motion to extend time. Only the certificate of service for defendants' responses to the July admission requests was included. The written answers to the July requests have yet to be filed. The answers to the plaintiffs' April requests were not filed with the court until November 20, 1987, although the certificate of service for these answers was filed on November 3, 1987.

Defendants' delay in filing the answers to the State's first requests to admit and their failure to file reponses to the State's second set are departures from the requirement of Fed.R.Civ. P. 5(d). Although service is the critical factor for Rule 36 purposes, Rule 5(d) requires that "[a]ll papers after the complaint shall be filed with the court either before service or within a reasonable time thereafter...." The State, however, did meet the requirements of Rule 5(d) by filing on September 21, 1987 both sets of its requests for admission.

of law and fact. The movants' applications for sanctions, under Rule 37, question the good faith of the responding parties.

These facets of the State's submission give rise to a subordinate controversy that, in fairness, requires further oral presentation. Since time is urged as an important factor in the request for summary disposition of the liability issue, the court will defer ruling on the motion to strike and for litigation costs and the amount for assessment until the record has been more fully developed on the merits. *See* 8 Wright, Miller and Elliott, *Federal Practice and Procedure* (Civil 2d) § 2261 n. 30.1 (1987 Pocket Part). Rule 36, Federal Rules of Civil Procedure.

■ Rule 36, in essence, is not a discovery device. Rather, it provides the means and method for obtaining concessions in the record of facts already known to the parties. Its principal function is to sift out triable issues.

> The answers to a party's request for admission pursuant to Rule 36 may eliminate or illuminate claimed genuine issues of fact, creating a clearer record upon which the district judge may determine the proper disposition of a summary judgment motion.

Pierce, "Summary Judgment: A Favorable Means of Summarily Resolving Disputes," 53 *Brooklyn L.Rev.* 279, 290 (1987); 8A Wright & Miller, *Federal Practice and Procedure:* Civil § 2253, n. 26.

To achieve its purposes, Rule 36 is enforceable by its own provisions. Each factual matter that is requested to be admitted "... is admitted, unless within 30 days after service of the request, or within such shorter or longer time as the court may allow, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter...."

As previously noted, the State's first requests to admit were served April 22, 1987. They were left unattended until the defendants' motion for an extension of time October 26; the requests remained unanswered until November 3, 1987. The time interval between service of the requests and the defendants' response constituted admissions within the provisions of Rule 36(a). *Donovan, Secretary of Labor v. Carls Drug Co., Inc.*, 703 F.2d 650, 651 (2d Cir. 1983).

The same holds true of the defendants' delay in responding to the second set of requests to admit. These requests were served July 10, 1987; the defendants' responses were not served until October 26, 1987.

The consequences for non-compliance are drastic:

> Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission.

Rule 36(b). Admission established by application of Rule 36 may be used as the basis for summary judgment. *Donovan v. Carls Drug Co., Inc.*, 703 F.2d at 651; *cf. Moosman v. Joseph P. Blitz, Inc.*, 358 F.2d 686, 688 (2d Cir.1966).

The opinion by Judge Oakes in *Donovan* points out that judicial discretion under Rule 36 is subject to two exceptions:

> [T]he court has the power to make exceptions to the Rule only when (1) the presentation of the merits will be aided and (2) no prejudice to the party obtaining the admission will result. Because the language of the Rule is permissive, the court is not required to make an exception to Rule 36 even if both the merits and prejudice issues cut in favor of the party seeking exception to the rule. Vesting such power in the district court is essential for Rule 36 admissions effectively to narrow issues and speed the resolution of claims.

703 F.2d at 652.

The court has consulted the opposing affidavits submitted by both sides of the controversy to weigh the interests of reaching the merits and the extent of prejudice to the interests represented by the complainants.[4]

---

**4.** At the time of oral argument on the plaintiffs' motion for summary judgment, the State filed

The defendants have brought forth no just cause or reason to excuse or withdraw the admissions imposed by Rule 36, as applied to the release of mercury through the exposure of Staco workers. The defendants' responses to the plaintiffs' requests for admission on this aspect of liability were not only untimely; many are defective in substance.

The defendants have failed to establish that the merits of the federal claims will be promoted by withdrawal of the Rule 36 admissions that relate to the migration of mercury through the exposure of Staco employees. More importantly, the prompt and orderly disposition of federal claims, based on domestic release, that are of immediate concern to the public health will be obstructed and delayed by proceeding to trial on that question. Contamination from that source is firmly supported in the present record.

On the other hand, the release of mercury by drainage from the closed plant in the summer of 1985 presents a triable issue of fact.

### State's Motion for Summary Adjudication

Pursuant to Fed.R.Civ.P. 56, the State of Vermont has moved for summary adjudication of liability on the following statutory claims:

(1) 42 U.S.C. § 9607(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA);

(2) 42 U.S.C. § 6972(a)(1)(B) of the Resource, Conservation, and Recovery Act (RCRA);

(3) 10 V.S.A. §§ 6610(a) and 6615 of the Vermont Waste Management Act.

the affidavit of a former Vermont State police officer, James D. Lilly, who had investigated the elevation of mercury levels at the Poultney Sewage Treatment Plant in July 1985. Corporal Lilly's affidavit reports an interview on September 24, 1987 with defendant Sirkus at Glens Falls, New York. The officer's affidavit sets forth various statements by Sirkus concerning cleaning operations at Staco during the summer of 1985.

At the hearing, defendants requested and were granted leave to respond to the Lilly affi-

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. (Emphasis in original). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Justice White's opinion in *Anderson* further instructs "... it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* This calls upon us to ascertain the essential elements of the particular claims which the State has moved for summary disposition.

### Liability—Comprehensive Environmental Response Compensation and Liability Act

▉▉▉ The State's first claim, as noted earlier, is based on the Comprehensive Environmental Response Compensation and Liability Act of 1980, 42 U.S.C. § 9601–9657 (CERCLA). The section upon

davit. Thereafter defendants submitted a written motion seeking permission to file additional affidavits. The State interposed vigorous objection and has moved to strike the post hearing affidavits submitted by the defendants on general grounds of prejudice and delay. However, the State itself submitted an untimely affidavit. In the interests of fairness and of reaching the merits of this action, the court has determined to consider both parties' late affidavits.

which the State relies is § 9607(a). This provision imposes liability for response costs on the following persons:

(1) the owner and operator of ... a facility,

(2) any person who at the time of disposal of any hazardous owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person, by any other party or entity ... and

(4) any person who accepts or accepted any hazardous substance for transport which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State ... not inconsistent with the native contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

42 U.S.C. § 9607(a) (1982).

In this enactment Congress authorized the plaintiffs, as "persons" under the enactment, to sue responsible parties for remedial and removal costs caused by the discharge and release of hazardous material. Liability is founded on responsibility, rather than fault.

Section 9607(a) holds the owner and operator of a facility, along with other persons designated by its terms, liable in the event "... there is a release or a threatened release which causes the incurrence of response costs, of a hazardous substance" from the facility. *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 (2d Cir.1985) (Oakes, J.).

[S]ection 9607(a)(1) unequivocally imposes strict liability on the current owner of a facility from which there is a release or threat of release, without regard to causation.

759 F.2d at 1044.

By its plain terms, equivalent liability is imposed under this provision on the operators of the facility.

The record at hand establishes that the corporate defendants, Staco, Inc., Chase Instruments Corporation and Keeper Corporation are within the cover of liability imposed by the provisions of CERCLA for the State's response costs. Section 9607(a)(1) imposes strict liability on the owners and operators of a facility where there is, or has been, a release or threat of release of a hazardous substance during the time of ownership and management. *Id.*

The defendant Staco manufactured thermometers in Poultney, Vermont from 1973 to 1984. Staco used mercury in the manufacture and production of the thermometers at its Poultney plant during that time period. The defendant Chase Instruments Corporation owns all the stock of Staco. The defendant Keeper Corporation holds the real estate on which the corporate activities of Staco and Chase in Poultney were conducted. Staco and Keeper are wholly owned subsidiaries of Chase. The Chase capital stock is entirely owned by the Munzer family; I. Walter is the majority stockholder.

The individual defendants, Robert and I. Walter Munzer, served as president and chairman of the board of Chase Instruments from 1973 to the present. The Munzers, as executive officers of Chase, participated in the control and management of Staco.

The defendant Sirkus testified in the 1984 state court proceedings that he managed and directed the operations of the Staco plant. Mr. Sirkus further testified that he, his father-in-law Walter Munzer, and Robert Munzer participated in the management and control of Staco operations during the time in suit.[5]

5. "We, the three of us, make decisions that re-

late to the managing businesses and the market-

The individual defendants, as owning and managing stockholders, are personally liable in their respective executive capacities in the corporate structure. All the corporate defendants, except for Chase Instruments Sales Corporation, are shown to be within the coverage of persons defined in 42 U.S.C. § 9607(a). *State of New York v. Shore Realty*, 759 F.2d *supra*, at 1052; *State of Idaho v. Bunker Hill Co.*, 635 F.Supp. 665, 671 (D.Idaho, 1986).

CERCLA defines the term "facility" to mean:

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), ... or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located....

42 U.S.C. § 9601(9).

Although the defendants have denied generally that the Staco plant is a facility within the terms of the statute, they admit the Poultney complex drains into the publicly owned Poultney sewer system which is served by the village sewage treatment facility. The record is conclusive that the Staco site in Poultney is a facility within the definition of the statute.

### Hazardous Substance

■ Although the defendants were called upon to admit under Rule 36 that mercury is a hazardous substance as defined by CERCLA, the only answer was an objection that the question called for a legal conclusion outside the scope of discovery. As noted earlier, Rule 36 is not a discovery device; it is a means for refining issues of fact and the law to be applied to the facts that are settled in the process.

Mercury constitutes a hazardous substance within the definition of 42 U.S.C. § 9601(14). The terms means:

(A) [A]ny substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to

section 9602 of this title ... [or] (E) any hazardous air pollutant listed under section 112 of the Clean Air Act.

Mercury is listed as a hazardous substance under 40 C.F.R. § 302.4, a regulation promulgated pursuant to 33 U.S.C. § 1321 and 42 U.S.C. § 9602. Mercury is also a hazardous substance under the Clean Air Act. *See* 42 U.S.C. § 7412 and 40 C.F.R. § 61.01.

Mercury is a substance that meets the broad cross references to other environmental statutes and regulations. It comes within the comprehensive application of CERCLA and is constituted a hazardous substance as a matter of law. *See United States v. New Castle County*, 642 F.Supp. 1270, 1273–74. (D.Del.1986).

Rule 36 contemplates that a request for admission may concern a question of fact, or the application of law to the facts. The record established that mercury is a hazardous substance under CERCLA. Defendants' objection in the delayed response to this initial set of requests is without substance.

### Release

For the State to prevail on its CERCLA claim under Rule 56 Fed.R.Civ.P., it must clearly show mercury was released to the environment. 42 U.S.C. § 9601(22) defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment...." Judicial interpretation has broadly construed the term "release" to include any environmental presence of a hazardous substance originating from a known industrial, manufacturing, or storage facility. *See, e.g., United States v. Metate Asbestos Corp.*, 584 F.Supp. 1143 (D.Ariz.1984) (transport of asbestos, a hazardous substance, by wind from the facility considered a release).

■ Migration of hazardous chemicals by drainage to publicly owned sewers from home plumbing systems, and the seepage and leaching from domestic septic systems that continues from earlier discharges, con-

ing businesses and the selling businesses and all the overall operations of the [Staco/Chase]

company." Deposition of Robert Sirkus, June 11, 1984, at 12.

stitute "release(s)" within the definition stated in section 9601(22). Liability for response costs covers not only a "release"; it attaches to "a threatened release" as well. 42 U.S.C. § 9607(a)(4)(A). *State of New York v. Shore Realty*, 789 F.2d at 1045.

The plaintiffs' complaint involves two releases of mercury. However, the State's claim for recovery under CERCLA in the present motion for partial summary judgment is confined to the release of mercury from the Staco facility on the bodies and clothing of workers. Threat of release to the ground water is involved by the presence of mercury in some workers' domestic septic systems that has the capability of leaching into the ground water. The State further contends that elevated levels of mercury in sludge stored at the Poultney Wastewater Treatment Facility resulted from drainage from workers' homes that were connected to the public sewer system.

██ In support of liability, the State has submitted extensive documentation sustaining the contention that mercury was released from the Staco plant on the bodies and clothing of the workers. As late as 1985, mercury contamination was finding its way into the workers' septic systems and into the Poultney sewer system. The documentation includes the affidavit of Roberta Coffin, M.D., Vermont's Commissioner of Health, which describes the mercury survey taken by Vermont Department of Health (VDOH) at the Staco plant and at workers' homes in March, 1984. The affidavit states that at a hearing on June 21, 1984, conducted by the VDOH, mercury had been found in the air of the homes of Staco workers and in the bodies of the workers' children. Also at that hearing the defendants stipulated that "[a]dequate mechanisms or controls to assure that mercury is prevented from inadvertent transport from Staco to the workers' homes do not exist."

Additionally, in support of its motions to strike, referred to earlier, the State has submitted abundant writings, obtained from defendants in discovery, clearly indicating defendants knew of and actually monitored exposure of Staco and Chase workers and the workers' children. Other documents produced by defendants describe their participation in the mercury cleanup of workers' homes and automobiles. Furthermore, in their papers opposing the State's summary judgment motion now before the court, defendants do not challenge in any meaningful way that mercury was released from the Staco plant and transported by the workers' bodies, garments and footwear.

The exposure of Staco workers and their families to mercury, the finding of mercury in the workers' homes and cars, and the resulting presence of mercury in workers' septic systems and the Poultney sewer system, were the subjects of plaintiffs' requests for admissions. There is no cause to withdraw or vacate the admissions prescribed by Rule 36 on these points. The procedural concessions are fully confirmed by the extensive documentation the State has submitted, including the affidavits of Dr. Roberta Coffin and Richard Phillips, Supervisor in the Vermont Agency of Environmental Conservation, as well as the records of Staco's own mercury assessments and cleanup.

There is factual support in the record for the State's claim that Staco's release of mercury endangers the ground water from leaching septic systems. The record includes evidence that the public sewer systems have been contaminated with mercury emptied from Staco workers' homes. A threat of release is posed by improper disposal of contaminated sludge produced at the Poultney Wastewater Treatment Facility. It appears that the treatment facility sludge contamination persists today. It derives in part from continued migration of mercury from those workers' homes that are connected directly to the Poultney sewer system.

Since stockpiled sludge may be drained inadvertently into the Poultney River, the sludge poses a threat to river quality. Furthermore, during the spring, summer and fall, mercury in the sludge spread on drying beds can volatilize into the air, threatening public health from this source.

In sum, by the evidence included in the record, the State has established that the defendants released mercury to the environment through the movement of workers to and from the Staco/Chase facility in Poultney. Related to this dispersion is the continued threat of release posed by the presence of mercury in workers' septic systems [6] and in the wastewater and resulting sludge which continues to be processed at Poultney's treatment works.

Against this resolute proof, the bare denials in defendants' belated responses to the State's series of requests for admissions are without substance. The court concludes that the named defendants, other than the Chase Instrument Sales Corporation, as owners and operators of the Staco plant, released mercury into the environment on the persons and personal effects of its workers. Although the Staco plant has remained closed since June 1984 by orders of the Commissioner of the Vermont Department of Health, the contamination and endangerment that originated in the manufacturing process persists to the present.

*Response Costs*

█ The remaining essential element to the plaintiffs' entitlement to recovery of expenditures is the causal connection between the release, or threat of release, and the costs incurred by the State in responding to the danger. The provisions of 42 U.S.C. § 9601(23), (24) and (25) define response costs to include "such actions as may be necessary to monitor, assess and evaluate the release or threat of release of hazardous substances."

The State has conducted extensive testing and monitoring of Staco workers, their families, homes, cars, plumbing, and septic systems to determine the extent of mercury contamination. The plaintiff has also carried out periodic assessments of mercury levels in the Poultney sewer system and treatment plant.

Costs incurred in assessing conditions at the Staco site and monitoring Staco workers, their families, and domestic septic systems for mercury contamination, are recoverable. The State incurred response costs to meet the harm and reduce the danger threatened by the past and continuing release of hazardous material that was introduced by the manufacture of mercury thermometers at Staco. Although the plant has been closed, the danger presently persists and threatens the future. This combination of factors in the proof submitted by the State is included in the meaning of "response costs" expressed in CERCLA. *See Shore Realty*, 789 F.2d at 1042–43; *City of New York v. Exxon Corp.*, 633 F.Supp. 609 (S.D.N.Y.1986) (Weinfeld, J.) (costs incurred for collecting and analyzing ground water samples, hydrogological studies, and monitoring the site of contamination source are included in response costs).

The State has submitted extensive accounting of the costs it has sustained as a consequence of the defendants' mercury release. The affidavit of Albert Lamson,

---

**6.** According to Dr. Roberta Coffin's affidavit, one septic tank of a Staco worker was tested. The test revealed high levels of mercury. This finding became the basis for a March VDOH Health Order requiring defendants to collect and test samples for mercury from other workers' septic systems. Defendants have not complied with this order. However, since high levels of mercury were found throughout other worker's homes connected to private septic tanks, there is a compelling inference mercury would be found in these other systems.

Defendants attempt to rebut this inference in the affidavit of John Zirschky, Ph.D., a project manager for an environmental consulting group hired by defendants, in part, to evaluate data "that contamination of the employees' septic tanks ... occurred." Zirschky's affidavit states:

the available data are not sufficient to suggest a septic tank contamination problem. The high mercury concentrations reported in the one septic tank could be attributed to a number of sources other than Staco/Chase or could be attributed to sampling and/or analytical error.

This affidavit is not pursuasive. The remarks of Mr. Zirschky are conclusive and speculative. There is no showing in the affidavit of what data were made available to him, and whether he was informed of the extent of mercury contamination in the many other Staco workers' homes. This affidavit does not meet the requirements of Fed.R.Civ.P. 56(e).

chief accountant for VDOH, describes how the costs were incurred and computed. Cost summaries, personnel time records, invoices and detailed itemized computer lists are attached to the affidavit as exhibits. According to these documents, the total expenditure relating to the State's response to defendants' release and threatened release of mercury described above, is $73,958.37.[7] The defendants' flat denial, unsupported by any satisfactory reason to question the nature and necessity for the State's expenditure, does not generate triable issues concerning the cause and effect of the State's response costs. The record, as it now stands, supports the conclusion that the defendants' release of mercury caused the State to incur response costs of $73,958.37.

In sum, the State has successfully established each element of its claim under CERCLA. The court concludes that the defendants Chase Instruments Corporation, Staco Inc., the Keeper Corporation, Robert Sirkus, Robert Munzer and I. Walter Munzer are liable to the State of Vermont, pursuant to 42 U.S.C. § 9607, in the amount submitted.

### Liability—Resource, Conservation and Recovery Act

■ The second federal claim presented by the State of Vermont is founded on liability and equitable relief provided pursuant to the Resource, Conservation and Recovery Act (RCRA), 42 U.S.A. § 6901 *et seq.* Responsibility under both federal statutes RCRA and CERCLA has a common purpose and impose strict liability. A prominent distinguishing aspect of RCRA is its enabling provision for equitable remedies. Injunctive relief against handling, storage, transport and disposal of hazardous waste may be invoked. The remedy

provided under CERCLA is essentially compensatory.

To establish defendants' liability under RCRA, the State of Vermont must show: (1) defendants are "persons" who (2) "contributed to" the "past or present handling storage, treatment, transportation or disposal" of a "hazardous waste"; and (3) mercury in the septic systems of Staco workers and mercury in the sewer system and Poultney Wastewater Treatment Facility "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). *United States v. Northeastern Pharmaceutical,* 810 F.2d 726, 745 (8th Cir.1986).

The related provisions of the federal statutory scheme confer authority for "the State" to institute suits to vindicate the rights of its citizens. *See* 42 U.S.C. § 6972(b)(2)(B) & (C) *as amended by* Pub.L. 98–616 (1984). *See also, Middlesex County Board v. New Jersey,* 645 F.Supp. 715, 718 (D.N.J.1986) (1984 amendment confers a new right for governmental instrumentality to sue for its citizens).

■ As defined by the statute, "person" includes both individuals and corporations and does not exclude corporate officers and employees. *See* 42 U.S.C. § 6903(15). As discussed under CERCLA, each individual defendant here was either personally involved in the corporate acts of Staco, or was in a position as a corporate office or major stockholder, to have "ultimate authority to control" the proper handling of mercury at the Staco plant. *United States v. Northeastern Pharmaceutical,* 810 F.2d at 745.

In keeping with discussion of response costs, Chase Instruments Corporation, the parent in the corporate structure, had authority to control Staco's operations; Staco itself used mercury in manufacturing ther-

---

7. VDOH's cost summary and the underlying documents supporting the State's claim for response costs in investigating and overseeing the cleanup of the workers' homes, cars, families, and household goods, were included in several of plaintiffs' requests for admissions. The plaintiffs' post hearing motions assert that the defendants objected to these requests on the grounds that plaintiffs were seeking admission of information within the knowledge of the State and that defendants had no independant knowledge or means of verification. Defendants' objection does not meet the demands of Fed.R.Civ.P. 36 since the cost data was made available to defendants with the serving of plaintiffs memorandum in support of their motion for partial summary judgment in September 1987.

mometers. Finally, Keeper Corporation, in the statutory sense, owned the real property where the mercury was stored, processed and disposed. These corporate defendants are "persons" under RCRA; Chase Sales Corporation, the remaining defendant, is not shown to be a responsible person who has contributed to the handling or disposal of the hazardous waste under the Act.

■ Section 6903(3) defines "disposal" under RCRA as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." "Handling" a hazardous substance also subjects persons to liability under RCRA, *see* 42 U.S.C. § 6972(a)(1)(B). While the statute leaves this term undefined, the defendants' use of mercury in the manufacturing process conducted at the Staco plant site, coupled with the inade-

quate protective procedures to prevent the employees from becoming carriers of mercury, constitutes handling within the Act.

In the presence of a plant environment that subjects workers to exposure to volatilized mercury, the lack of expertise in dealing with the release constitutes a threat which the federal environmental enactments condemn. The same holds true to the problem created by drainage into the public facilities. *E.g. State of New York v. Shore Realty Corp., supra,* 789 F.2d at 1045.

■ The crucial factors essential to equitable relief under RCRA are the presence of mercury in the domestic septic systems, the contamination of Staco workers' home environment, and the endangerment it presents. On these points the affidavit of Roberta R. Coffin, M.D., Commissioner of Health for the State of Vermont, and the attached documentation provide adequate support in full, clear and convincing measure. The affidavit is set forth in the margin.[8] It shows that the affiant is com-

8.           U.S. DISTRICT COURT
DISTRICT OF VERMONT
Sept. 21, 1987
STATE OF VERMONT
CHITTENDEN COUNTY
    I, Roberta Coffin, M.D., Commissioner of Health, being first duly sworn, depose and say:
    1. In March, 1984, the Vermont Department of Health under my direction conducted a mercury survey at the Staco/Chase manufacturing plant in Poultney, Vermont, and at Staco workers' households.
    2. Mercury air samples were gathered in the plant and in the plant workers' homes. Urine samples were collected from plant workers and one randomly selected child in each participating household.
    3. Detectable mercury-in-air was found in 19 (82%) of the 23 houses sampled (range 0–23.30 mcg/cubic meter). Elevated urinary mercury levels ($> 20$ mcg/1) were identified in 18 (78%) of 23 children aged 2–20 years who live in these households (range 2.5 to 245.0 mcg/1). (See study attached.)
    4. As Commissioner of Health, I issued a Health Order on June 6, 1984, (attached) ordering Staco, Inc., Chase Instruments Corp., Robert Munzer, President (Chase), I. Walter Munzer, President (Staco), Robert Sirkus, Vice–President and General Manager (Staco) to cease operations of the businesses described in the health orders until they could assure me that no mercury would be removed from the plant except in

a completed, packaged product or by acceptable waste disposal methods.
    5. At the request of defendants in this section, a hearing was held on June 21, 1984, and testimony was taken to show cause why the Health Order of June 8, 1984 should not continue in effect. At that hearing, defendants stipulated to the following findings made in the June 8, 1984 order:
    a) The business of Staco, Inc. is the manufacture of mercury thermometers. Mercury is actually used in the plant for this purpose.
    b) Mercury is a chemical which is toxic to humans. Mercury poisoning can cause central nervous system and kidney damage.
    c) Mercury has been found in the bodies of children of workers at the Staco plant at elevated levels which may constitute an abnormal body burden subject to verification by further testing.
    d) Mercury has been found in the air of the homes of workers at the Staco plant in elevated levels.
    e) Adequate mechanisms or controls to assure that mercury is prevented from inadvertent transport from Staco to the workers' homes do not exist. (Order attached.)
    6. On August 15, 1984, I issued a Health Order requiring that the homes and automobiles of Staco workers be decontaminated, under a protocol developed and overseen by Health Department personnel, and ordering monitoring after cleaning procedures were completed. The

petent to testify and present evidence by way of the attached documentation. The content of this submission is admissible under the Federal Rules of Evidence within the requirement of Fed.R.Civ.P. 56(c).

Briefly stated, the affidavit confirms a 1984 mercury survey of the Staco/Chase plant complex. The survey included samples gathered in the plant and at Staco workers' homes. It also included analysis of body fluids of employees and their children that disclosed evidence of elevated mercury levels. The straightforward medical evidence submitted by the State implicates health hazards that require effective remedial action.

As to the endangerment of the public health, in the prior administration proceedings, referred to above, the defendants stipulated that "[m]ercury is a chemical which is toxic to humans. Mercury poisoning can cause central nervous system and kidney damage." Later, in the state superior court action, the deposition of the defendants' medical expert, Woodhall Stopford, M.D., an occupational physician, testified:

> The other potential environmental impact [from the presence of mercury in the sludge] is significant levels of mercury vapor being given off from the contaminated sludge that will adversely affect the health of humans living in and around a sewage treatment plant.

(Deposition of Woodhall Stopford, Sept. 11, 1984 at 5).

The force and effect of the defendants' responses, as adverse parties, to the State's affirmative showing, do not meet the requirements of Fed.R.Civ.P. 56(e). The defendants have failed to provide, by affida-

vit or otherwise, specific facts showing that there is a genuine issue for trial on the question of domestic sewage contamination by the migration of mercury on the garments and personal effects of the Staco workers moving to and from the plant to their home sites.

The court concludes liability is established under RCRA. The record justifies protective equitable relief against the public danger it presents.

*Plant Drainage Release—Summer 1985*

█ The State's remaining claim under RCRA is based on the proposition that the defendants discharged mercury in the course of a cleaning project at the Staco plant site during the summer of 1985. The claim is based on the premise that the cleanup was uncontrolled and done without a state permit. The 1985 drainage contamination is assigned by the State as the principal cause of elevated mercury levels found in testing and site examination conducted before and after the release by Richard I. Phillips, C.E. Supervisor of the Operation and Maintenance Section of Vermont Agency of Environmental Conservation. The State monitoring of the Staco plumbing system, over the extended time period from October 1984 through August 1985, led Phillips to conclude "that it is more likely than not that additional mercury entered the (Poultney) system from the Staco/Chase buildings between June 1 and July 15, 1985 and amounted to at least 0.5 pounds of mercury."

The defendants contest the validity of this conclusion by affidavit of John Zirschky, referred to above. The integrity

decontamination of the homes was subject to further orders. (Orders attached.)

7. On March 15, 1985 I issued a Health Order finding that high levels of mercury were detected in a sample of sludge collected from Mrs. Gary Thomas's septic tank, that the mercury in the septic tank could flow into the tile field and contaminate groundwater and individual wells, and ordering, inter alia, that the defendants collect and test sludge samples for mercury from the septic systems. Defendants did not comply with the Order. (Order attached.)

8. In my judgment, the mercury contamination of workers, their children, their homes, plumbing and automobiles presented a health hazard requiring investigation, assessment and remedial directives from the Department of Health, and necessitating the incurrence of response costs as set forth in the affidavits of accounting personnel of the Department.

/s/ Roberta R. Coffin, M.D.
Roberta R. Coffin, M.D.
Commissioner of Health

Subscribed and sworn to before me this 31st day of March, 1987.

/s/ Lillian S. Golavin
Notary Public
My Commission Expires 2/10/91

of the data obtained and the means and methods used in collecting the information are also contested by opposing affidavits of the Staco plant manager, Steven Lawless, and the defendant Robert Sirkus. The contest in the record, by way of opposing affidavits, involves questions of credibility and the factual basis which form the underpinnings of the competing expert opinions advanced by both sides.

The conspectus of the evidence, bearing on the alleged drainage release in 1985, presents triable issues of fact that are beyond the reach of summary adjudication under Fed.R.Civ.P. 56(c). The expert opinion advanced by the environmental agency representative is guardedly expressed in terms of "more likely than not." The true answer on this point remains to be determined on a more complete record, or trial if necessary, if continuing discovery leaves the question unsettled. *E.g. Fortner Enterprises v. U.S. Steel*, 394 U.S. 495, 500, 89 S.Ct. 1252, 1257, 22 L.Ed.2d 495 (1969); 10 and 10A Wright, Miller & Kane, Civil 2d § 2725.

### Pendent Claims

■ The plaintiffs have invoked the court's discretion to grant summary adjudication of the State's pendent claim based on the Vermont Waste Management statute, 10 V.S.A. §§ 6610a and 6615 to obtain injunctive relief, fines, and penalties provided under the state enactment.

> It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.

*United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

In *State of New York v. Shore Realty Corp.*, 759 F.2d at 1050, the court of appeals held the district court properly exercised its discretion in granting injunctive relief on the strength of the state public nuisance, since injunctive relief was not then available, nor authorized under CERCLA. *Id.* at 1049. Here the plaintiffs' right to injunctive relief is provided by RCRA. Whether the plaintiffs make out sufficient reason for the court to exercise pendent jurisdiction under the teaching of *United Mine Workers v. Gibbs*, remains to be determined at trial on the merits.

It will be so directed in the interlocutory order to be entered, as provided in Rule 56(c) Fed.R.Civ.P.