**AMOCO OIL COMPANY,**
Plaintiff–Appellant,

v.

**BORDEN, INC., Defendant–Appellee.**

No. 88–2860.

United States Court of Appeals,
Fifth Circuit.

Dec. 8, 1989.

Opinion on Denial of Rehearing
Jan. 23, 1990.

---

Edward W. Warren, David G. Norrell, Joseph S. Hoover, Jr., Washington, D.C., McLeod, Alexander, Powel & Apffel, Ervin A. Apfell, Jr., Otto D. Hewitt, III, Galveston, Tex., Jana Gill, Washington, D.C., for plaintiff-appellant.

Blake A. Watson, Appellate Section, Land & Natural Resources Div., Washington, D.C., amicus curiae for U.S.

Thomas W. Hill, Melvin D. Weinstein, Emens, Hurd, Kegler & Ritter, and Lawrence L. Dieker, Columbus, Ohio, for defendant-appellee.

Before BROWN, REAVLEY and HIGGINBOTHAM, Circuit Judges.

REAVLEY, Circuit Judge:

In a private action brought under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C.A. §§ 9601–9675 (1983 & Supp.1989),[1] Amoco Oil Co. ("Amoco") sought a declaratory judgment for liability and response cost damages from Borden, Inc. ("Borden"), from which Amoco had purchased contaminated industrial property. Finding that Amoco had failed to establish CERCLA liability, the district court entered judgment for Borden. Holding that Amoco has met the liability requirements, we reverse and remand for determination of damages.

I. Background

The property at issue is a 114–acre tract of land in Texas City, Texas. For many years, Borden operated a phosphate fertilizer plant on the site. As a by-product of the fertilizer manufacturing process, large quantities of phosphogypsum were produced. The site now contains a large inactive pile of phosphogypsum covering approximately 35 acres.

Phosphogypsum alone contains low levels of radioactivity. More highly radioactive sludges and scales from processing equipment, however, were dumped into the phosphogypsum pile, creating "hot" areas within the pile. Additionally, during processing, radioactive materials became concentrated in manufacturing equipment, pipe, and filter cloths used in production. These materials constitute "off-pile" wastes and were left primarily near a junkyard on the property and near the abandoned manufacturing buildings. Some of the off-pile sites contain over 500 times the background level of radiation.[2]

In 1977, Amoco became interested in purchasing the property. The parties discussed two prices: $1.8 million for the site "as is," or $2.2 million if Borden would remove the phosphogypsum. Allegedly unaware of the site's radioactivity, Amoco accepted the "as is" option.

Amoco claims it had no knowledge of the radioactive nature of phosphogypsum until it was so informed by the Texas Department of Water Resources in 1978. Amoco then hired several consultants to measure the radioactivity, to determine geology and hydrology, and to characterize the data. The consultant's reports revealed the various elevated radiation levels throughout the site. The site is currently unused and is secured with fences and guards to prevent access. Amoco claims that permanent remedial action will cost between $11 million and $17 million.

In 1982, Amoco brought this action in diversity, alleging various state law claims, including fraud and breach of contract. It later added the CERCLA claim to recover response costs incurred as a result of the radioactive contamination. The state law claims were tried to a jury. The jury found that Borden did not fraudulently misrepresent the condition of the property, but did find that Borden did not deliver the building, equipment, and machinery in a "clean and healthful" condition, as it had expressly warranted. Yet, because the jury also

1. All statutory references are to amended provisions of CERCLA contained in the 1989 supplement unless stated otherwise.

2. Background levels indicate natural soil radiation in the area. The background levels for the property were determined from samples obtained at a neighboring city, La Marque, Texas.

found that Amoco should have known about the radioactivity prior to April 16, 1978, that claim was barred by the statute of limitations.

Amoco continued to pursue its CERCLA cost recovery claim, which the district court bifurcated into liability and remedial phases. Borden's primary defenses against liability were: (1) that it had sold the property on an "as is" basis, and that this fact and the doctrine of *caveat emptor* should preclude a finding of liability; and (2) that the levels of radiation emanating from the site are not high enough to be considered a release of a hazardous substance within the meaning of CERCLA.

On February 2, 1987, the district court issued a Memorandum and Order denying Amoco's motion for entry of judgment on the CERCLA claim. In that order, the court rejected Borden's *caveat emptor* argument, holding that common-law defenses do not apply to CERCLA claims and that there can be no implied transfer of CERCLA liability. The court further held, however, that Amoco must prove that some threshold level of radioactivity exists at the site in order to establish CERCLA liability and selected the standards for remedial actions at inactive uranium processing sites, *see* 40 C.F.R. Part 192 (1988) ("Inactive Tailings Standards"), promulgated by the Environmental Protection Agency ("EPA") under the Uranium Mill Tailings Radiation Control Act, 42 U.S.C.A. §§ 7901–7942 (1983 & Supp.1989), to determine hazardous radionuclide levels.

After hearing evidence at a later trial, the court used data that averaged radiation levels throughout the phosphogypsum pile and concluded that the property's radiation levels did not exceed the Inactive Tailings Standards. It then entered judgment for Borden. Amoco appeals the court's holding that a threshold level of radionuclides must be shown to exist at the site to establish CERCLA liability, the appropriateness of the Inactive Tailings Standards for defining that threshold, and the court's application of that standard.

II. Discussion

A. CERCLA

Congress enacted CERCLA in response to well-publicized toxic waste problems. H.R.Rep. No. 1016, 96th Cong., 2d Sess., pt. I, at 17–18 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6120 [hereinafter House Report]; *Developments*

*in the Law—Toxic Waste Litigation*, 99 Harv.L.Rev. 1458, 1466 (1986) [hereinafter *Developments*]. Yet, because the final version was enacted as a "last-minute compromise" between three competing bills, it has "acquired a well-deserved notoriety for vaguely-drafted provisions and an indefinite, if not contradictory, legislative history." *United States v. Mottolo*, 605 F.Supp. 898, 902, 905 (D.N.H.1985).

CERCLA substantially changed the legal machinery used to enforce environmental cleanup efforts and was enacted to fill gaps left in an earlier statute, the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C.A. §§ 6901–6987 (1983 & Supp.1989), *as amended by* Solid Waste Disposal Act Amendments of 1980, Pub.L. No. 96–482, 94 Stat. 2334. House Report, at 22, *reprinted in* 1980 U.S.Code Cong. & Admin.News at 6125; *Developments*, 99 Harv.L.Rev. at 1470–71. The RCRA left inactive sites largely unmonitored by the EPA unless they posed an imminent hazard. House Report, at 21–22, *reprinted in* 1980 U.S.Code Cong. & Admin.News at 6124–25. CERCLA addressed this problem "by establishing a means of controlling and financing both governmental and private responses to hazardous releases at abandoned and inactive waste disposal sites." *Bulk Distribution Centers, Inc. v. Monsanto Co.*, 589 F.Supp. 1437, 1441 (S.D.Fla. 1984); *see New York v. Shore Realty Corp.*, 759 F.2d 1032, 1041–42 (2d Cir.1985). Section 9607(a), one of CERCLA's key provisions for furthering this objective, permits both government and private plaintiffs to recover from responsible parties the costs incurred in cleaning up and responding to hazardous substances at those sites.

Because of the complexity of CERCLA cases, which often involve multiple defendants and difficult remedial questions, courts have bifurcated the liability and remedial, or damages, phases of CERCLA litigation. *See United States v. Wade*, 653 F.Supp. 11, 14–15 (E.D.Pa.1984); *cf. United States v. Mottolo*, 695 F.Supp. 615, 620–21 (D.N.H.1988) (resolving liability by summary judgment); *United States v. Bliss*, 667 F.Supp. 1298, 1308–09 (E.D.Mo.1987) (same). In doing so, disputed factual and legal issues pertaining only to liability are resolved before deciding the more complicated and technical questions of appropriate cleanup measures and the proportionate fault of liable parties. Bifurcation and

the use of summary judgment provide efficient approaches to these cases by narrowing the issues at each phase, by avoiding remedial questions if no liability attaches, and by potentially hastening remedial action or settlement discussions once liability is determined. *See Mottolo,* 695 F.Supp. at 620–21; *Bliss,* 667 F.Supp. at 1308–09; *Wade,* 653 F.Supp. at 14–15.

### B. Liability

■ To establish a prima facie case of liability in a CERCLA cost recovery action, a plaintiff must prove: (1) that the site in question is a "facility" as defined in § 9601(9); (2) that the defendant is a responsible person under § 9607(a); (3) that a release or a threatened release of a hazardous substance has occurred; and (4) that the release or threatened release has caused the plaintiff to incur response costs. *See, e.g., Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152–53 (9th Cir. 1989); *Southland Corp. v. Ashland Oil, Inc.,* 696 F.Supp. 994, 999 (D.N.J.), *rev'd on rehearing on other grounds,* No. 88–0700, 1988 WL 125855 (D.N.J. Nov. 23, 1988) (WESTLAW, Dctu Database). If the plaintiff establishes each of these elements and the defendant is unable to establish the applicability of one of the defenses listed in § 9607(b),[3] the plaintiff is entitled to summary judgment on the liability issue. *See T & E Indus., Inc. v. Safety Light Corp.,* 680 F.Supp. 696, 708 (D.N.J.1988). This is true even when "there is a genuine issue as to appropriate damages." *Mottolo,* 695 F.Supp. at 620.

A plaintiff may recover those response costs that are necessary and consistent with the National Contingency Plan ("NCP"). § 9607(a)(4)(B); *see* 40 C.F.R. Part 300 (1988). Thus, once liability is established, the court must determine the appropriate remedy and which costs are recoverable. The court then must ascertain, under CERCLA's contribution provision, each responsible party's equitable share of the cleanup costs. § 9613(f).

It is undisputed that Amoco's property falls within the statutory definition of a "facility";[4] that Borden is a responsible party within the meaning of CERCLA;[5] and that the statutory defenses to liability are inapplicable. The question of liability centers around the determination of whether a release of a hazardous substance has occurred. Amoco and the EPA, as *amicus curiae,* specifically claim that the district court erred in requiring Amoco to show that the property's radioactive emissions violated a quantitative threshold to establish the release of a hazardous substance within the meaning of § 9607(a)(4). That section provides in relevant part:

[A]ny person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

. . . .

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

. . . .

### 1. Hazardous Substance

■ Radium–226, the primary radioactive waste on the property, decays to form a gas, radon–222, and solid "daughter products."[6] Radon and its daughter products are considered radionuclides, which are defined as "any nuclide that emits radiation." 40 C.F.R. § 61.91(c) (1988). The term hazardous substance includes "any element, compound, mixture, solution, or substance designated pursuant to section 9602 of [CERCLA], ... [and] any hazardous air pollutant listed under section 112 of the Clean Air Act...." § 9601(14). The EPA

---

**3.** To establish a defense to liability, a defendant must prove by a preponderance of the evidence that the release or threat of a release of a hazardous substance and the resulting damages "were caused solely by—(1) an act of God; (2) an act of war; [or] (3) an act or omission of a third party...." § 9607(b).

**4.** CERCLA defines "facility" as "(A) any building, structure, installation, equipment, pipe or pipeline ..., well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been

deposited, stored, disposed of, or placed, or otherwise come to be located...." § 9601(9).

**5.** Under § 9607(a) liability is imposed on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." The definition of "person" includes "an individual, firm, corporation, association, partnership, consortium, joint venture, [or] commercial entity...." § 9601(21).

**6.** The new element resulting from the atomic disintegration of a radioactive element is called the daughter of the original element.

has designated radionuclides as hazardous substances under § 9602(a) of CERCLA. *See* 40 C.F.R. § 302.4 (1988). Additionally, the regulations promulgated by the EPA under § 112 of the Clean Air Act, 42 U.S.C. § 7412, list radionuclides as a hazardous air pollutant. *See* 40 C.F.R. § 61.01(a) (1988).

The plain statutory language fails to impose any quantitative requirement on the term hazardous substance and we decline to imply that any is necessary. Radionuclides meet the listing requirements and therefore the radioactive materials on Amoco's property are hazardous substances within the meaning of CERCLA.

This holding is supported by courts that have considered the definitional requirements of the term and congressional comments contained in the legislative history. *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1151–52 (1st Cir.1989) (listing establishes that a substance is hazardous); *Eagle–Picher Indus. v. United States EPA*, 759 F.2d 922, 927 (D.C.Cir.1985) ("substance is a 'hazardous substance' within the meaning of CERCLA if it qualifies under *any* of" the statute's definitional requirements); *Vermont v. Staco, Inc.*, 684 F.Supp. 822, 832 (D.Vt. 1988) (listing establishes substance is hazardous as a matter of law); *T & E Indus.*, 680 F.Supp. at 709 (presence of a hazardous substance indicated since "radionuclides, such as radium and radon, have been designated as 'hazardous substances' under CERCLA"); *United States v. Metate Asbestos Corp.*, 584 F.Supp. 1143, 1147 (D.Ariz.1984) (substance is hazardous if it meets the listing requirements); *United States v. Wade*, 577 F.Supp. 1326, 1339–41 (E.D.Pa.1983) (listed substance is hazardous regardless of the concentration or amount of any particular discharge); S.Rep. No. 848, 96th Cong., 2d Sess. 24–28 (1980).

**2. Release**

The term "release" is defined to mean: "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)...." § 9601(22). As with "hazardous substance," the plain statutory language fails to impose any quantitative requirement on the term "release." We believe that the definition of "release" should be construed broadly, *see Shore Realty*, 759 F.2d at 1038 & n. 4, 1045 ("release" includes leaking tanks and pipelines); *Staco, Inc.*, 684 F.Supp. at 832–33 ("release" includes migration of hazardous chemicals *to* public and private sewer systems; "threatened release" includes presence of mercury in septic systems with capability of leaching into the groundwater); *Metate Asbestos*, 584 F.Supp. at 1149 ("release" includes transport of asbestos by the wind), "to avoid frustrat[ing] the beneficial legislative purposes." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir.1986).

Borden's actions met the release requirement in two ways. First, it did so by disposing of the phosphogypsum and highly radioactive wastes on the property. *See* § 9601(22). Second, the gas emanating from the radionuclides constitutes a release within the meaning of the statute. *See* 54 Fed.Reg. 22524, 22526 (1989).

**3. Response Costs**

The statutory provision suggesting a threshold for liability is the requirement that a release or threatened release have "caus[ed] the incurrence of response costs." § 9607(a)(4). Response costs are generally and specifically defined to include a variety of actions designed to protect the public health or the environment.[7] To just-

---

7. In § 9601(25) "response" is defined to mean "remove, removal, remedy, and remedial action...." In turn, these terms are further defined in the statute.

Section 9601(23) defines "remove" or "removal" to include

the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as

may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. Section 9601(24) defines "remedy" or "remedial action" to include, among others, "those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment."

ifiably incur response costs, one necessarily must have acted to contain a release threatening the public health or the environment.

■ In our interpretation of the requirement that a release "cause[ ] the incurrence of response costs," we are notably entering unexplored territory. As with many of CERCLA's provisions, the legislative history is bereft of discussion about the causal nexus between releases and response costs. Additionally, courts have not been faced with a scenario suggesting that a plaintiff's action was not justified by the hazard posed.[8] Borden argues that this case presents such a situation.[9]

■ Borden has pointed out that all matter is radioactive to some degree. While harmless at low concentrations, at some point on a continuum it poses an unacceptable risk to human life and the environment. Given CERCLA's broad liability provisions and the pervasive nature of radionuclides, Borden argues that without a quantitative limit CERCLA liability could attach to the release of any substance and theoretically could reach "everything in the United States."[10] The district court was apparently persuaded by Borden's argument. In finding a standard essential, it noted that "[m]ost of the radionuclides in the atmosphere come from natural sources [and that] radionuclides are used or produced in thousands of locations throughout the United States."

Yet, concerns about the most extreme reach of liability—extending to naturally occurring hazardous substances—are misplaced. Remedial actions taken in response to hazardous substances as they occur naturally are specifically excluded from the NCP and are therefore not recoverable. § 9604(a)(3)(A). The only concern that should support the use of a quantitative measure at the liability phase is potential abuse of the broad provisions, which may subject some defendants to harassing litigation.

Amoco and the EPA argue that CERCLA liability attaches upon the release of *any* quantity of a hazardous substance and that the extent of a release should be considered only at the remedial phase. However, we must reject this approach because adherence to that view would permit CERCLA's reach to exceed its statutory purposes by holding parties liable who have not posed any threat to the public or the environment.[11] Accordingly, we find use of a standard of justification acceptable for determining whether a release or threatened release of a hazardous substance has caused the incurrence of response costs. In the absence of any specific direction from Congress, we believe that the question of whether a release has caused the incurrence of response costs should rest upon a factual inquiry into the circumstances of a case and the relevant factual inquiry should focus on whether the particular hazard justified any response actions.

8. Several courts have interpreted the causation requirement in a different context—for determining the standard of proof necessary to show a defendant is responsible for the hazard that resulted in response costs. For that purpose, the causation requirement has been interpreted in a somewhat relaxed manner due to difficult proof problems inherent in toxic waste cases and CERCLA's broad liability provisions. Accordingly, in cases involving multiple sources of contamination, a plaintiff need not prove a specific causal link between costs incurred and an individual generator's waste. *Wade,* 577 F.Supp. at 1333-34; *see Dedham Water Co.,* 889 F.2d at 1155; *Artesian Water Co. v. New Castle County,* 659 F.Supp. 1269, 1282 (D.Del.1987), *aff'd,* 851 F.2d 643 (3d Cir.1988). Moreover, parties falling within the statutory definitions of responsible persons are strictly liable for "a release or threat of a release, without regard to causation." *Shore Realty,* 759 F.2d at 1044 (applied to current owner of a facility).

9. Borden claims that the radiation generated by the phosphogypsum pile poses a minimal health

risk to the surrounding population. According to Borden's calculations, the pile's radiation presents the possibility that one additional cancer death may occur every 400 years. As is discussed below, however, the measure of radioactivity on which this calculation was based does not fully represent the hazard on the property.

10. We note also that this is not unique to radionuclides. The EPA has listed several other substances, such as zinc, sodium, and selenium, that are present in most soil. *See* 40 C.F.R. § 302.4 (1988). Harmless and, indeed, essential to humans at low levels, they are also toxic in higher concentrations.

11. While the EPA argues that its interpretation of CERCLA's liability scheme is entitled to deference, final authority for statutory construction rests with the courts. *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 31–32, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981).

CERCLA's provisions provide guidance for making this determination.

Section 9621(d) governs the extent of cleanup, which is required "at a minimum [to] assure[ ] protection of human health and the environment." § 9621(d)(1). To attain that goal, the scope of remedial action may be established by any "legally applicable or relevant and appropriate ... requirement" ("ARAR"). § 9621(d)(2)(A). ARARs include "any standard, requirement, criteria, or limitation under any Federal environmental law" or any more stringent "State environmental or facility siting law." *Id.* As these standards define the limits of appropriate response costs, and therefore recoverable expenses, they are also useful for establishing the limits of liability. While not the exclusive means of justifying response costs, we hold that a plaintiff who has incurred response costs meets the liability requirement as a matter of law if it is shown that *any* release violates, or any threatened release is likely to violate, *any* applicable state or federal standard, including the most stringent.

Amoco has clearly met this requirement by showing that the radioactive emissions exceeded the limits set in Subpart B of the Inactive Tailings Standards,[12] which provides that:

(a) The concentration of radium–226 in land averaged over an area of 100 square meters shall not exceed the background level by more than—
(1) 5 pCi/g,[13] averaged over the first 15 cm of soil below the surface, and
(2) 15 pCi/g, averaged over 15 cm thick layers of soil more than 15 cm below the surface.

40 C.F.R. 192.12 (1988).

▪ Amoco presented evidence that the background level of radium–226 was 0.5 pCi/g. The phosphogypsum pile contains an average radium concentration of 40 pCi/g. Samples from the buildings and the junkyard contained radium levels ranging from 661 pCi/g to 816 pCi/g. Some materials found in the junkyard had concentrations up to 24,000 pCi/g and residue in a pipe between the junkyard and a surge pond contained a concentration of over 60,000 pCi/g. As these measurements clearly exceed an applicable standard, Amoco was justified in incurring response costs as a matter of law. Moreover, the excessive radiation in the hot spots, which exceeds any possible standard protective of public health, justified response actions regardless of any overall measure of the site's radiation.

The district court determined that there was an insufficient release of a hazardous substance based on its application of Subpart A, a less stringent standard. In applying this standard, the district court used an average measure of radiation from the site. Samples from which this average was derived were taken primarily from the pile. While the average included a few measurements from off-pile sites, these samples were apparently not taken from the most highly radioactive areas.[14] Since that figure did not exceed the Subpart A standard, the district court held that Amoco failed to establish CERCLA liability.

The district court erred initially by using a less stringent standard. The error, how-

---

**12.** While these standards were not devised to regulate phosphogypsum piles, all parties agree that these standards are applicable because the inactive uranium mill tailings piles, which they regulate, emit the same radioactive materials and present similar environmental problems.

**13.** Radioactivity is measured in picocuries. A picocurie is a unit of radioactivity equal to one-trillionth of a curie and represents 2.22 radioactive disintegrations per minute. Radium–226, one of the radioactive substances on the property, is measured by weight in pCi/g, or picocuries per gram of the substance measured.

**14.** Subpart A measures the radon flux, or the emissions of the gas radon–222, and uses two types of measurements, pCi/m2–s, which indicates the amount of radon gas escaping from a square meter of the surface each second, and pCi/L, which indicates the amount of gas contained in a liter of air.

Under Subpart A cleanup efforts must provide reasonable assurance that the radon flux does not exceed an average release rate of 20 pCi/m2–s or that the annual concentration of radon–222 in the air outside a disposal site does not exceed the background levels by 0.5 pCi/L. Amoco's consultant provided an average measurement from the site of 10.5 pCi/m2–s, which did not include the most highly radioactive off-pile areas, some of which were estimated at 100 pCi/m2–s. The district court found that this and other average measurements did not exceed the Subpart A standard.

ever, was compounded by using a measurement of site radioactivity that excluded the most contaminated materials. That reading portrayed the property as containing only the most minimal contamination.

■ Amoco's security measures and site investigation are acceptable response costs within the meaning of CERCLA. *See Ascon Properties*, 866 F.2d at 1154–56; *Cadillac Fairview/Cal. v. Dow Chem. Co.*, 840 F.2d 691, 695 (9th Cir.1988); *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 892 (9th Cir.1986). As there has been a release of a hazardous substance that justified the incurrence of response costs and the other elements of a prima facie case have been met, Amoco is entitled to summary judgment on the liability issue.

## C. Damages

Under CERCLA, a private plaintiff may recover only those response costs that are necessary and consistent with the NCP. § 9607(a)(4)(B). The NCP has been promulgated by the EPA, 40 C.F.R. Part 300 (1988), and "establish[es] procedures and standards for responding to releases of hazardous substances...." § 9605(a). Under the NCP, cleanup efforts are designed to meet CERCLA's goals for cost-effective remedial action that adequately protects public health and the environment. *See* § 9621(a)–(b). ARARs define the limits of remedial efforts and must be selected from applicable federal standards or more stringent state standards. § 9621(d). Once the applicable ARARs are established, a district court must determine which of the standards will provide remedial action most consistent with the NCP.

While the strictest standard may be used for the purposes of establishing liability, it will not govern remedial actions unless consistent with the NCP. *See* 40 C.F.R. § 300.68(i) (1988); H.R.Rep. No. 253 pt. V, 99th Cong., 2d Sess. 53–54, *reprinted in* 1986 U.S.Code Cong. & Admin.News 2835, 3176–77 [hereinafter Amendments Report] (suggesting that barring certain circumstances, the most stringent federal standard must be applied); *see also id.* at 54, *reprinted in* 1986 U.S.Code Cong. & Admin.News at 3177 (suggesting that if a cost effective remedial action is feasible and will achieve a more stringent state stan-

dard, the state standard should control). The justification standard provides a broad net for establishing liability, consistent with CERCLA's liability provisions, leaving remedial and responsibility determinations for a later stage.

In this case, the district court considered only one possible ARAR, the Inactive Tailings Standards. The court, however, will have to revisit its application of the standard and determine whether other ARARs are more appropriate. *See* 40 C.F.R. § 300.68(i) (1988). Some other standards to consider include the EPA's new regulations for radionuclide emissions from phosphogypsum piles, which should be finalized soon, *see* 54 Fed.Reg. 9612, 9612 (1989); the EPA's maximum contaminant levels for Radium–226, adopted under the authority of the Safe Drinking Water Act, 42 U.S.C. § 300g–1, *see* 40 C.F.R. 141.15 (1988); any appropriate regulations for groundwater contamination; and any Texas standards concerning radiation contamination of soil, vegetation, or groundwater.

■ The hazard on the property constitutes an indivisible harm. *See United States v. Monsanto Co.*, 858 F.2d 160, 171 (4th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). As an owner of a facility that continues to release a hazardous substance, Amoco shares joint and several liability for remedial actions with Borden. *Id.* at 168–69; *Shore Realty*, 759 F.2d at 1043–45; *see* Amendments Report, pt. I, at 74, *reprinted in* 1986 U.S.Code Cong. & Admin.News at 2856. When one liable party sues another to recover its equitable share of the response costs, the action is one for contribution, which is specifically recognized under CERCLA. *See* § 9613(f).

■ Under that provision a court has considerable latitude in determining each party's equitable share. After deciding the appropriate remedial action, the court will have to determine each party's share of the costs. Possible relevant factors include: "the amount of hazardous substances involved; the degree of toxicity or hazard of the materials involved; the degree of involvement by parties in the generation, transportation, treatment, storage, or disposal of the substances; the degree of care exercised by the parties with respect to the substances involved; and the degree of co-

operation of the parties with government officials to prevent any harm to public health or the environment." Amendments Report, pt. III, at 19, *reprinted in* 1986 U.S.Code Cong. & Admin.News at 3042; *see Monsanto*, 858 F.2d at 168 n. 13. Additionally, the circumstances and conditions involved in the property's conveyance, including the price paid and discounts granted, should be weighed in allocating response costs. *See Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 90 (3d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989).

Borden does not challenge the *caveat emptor* holding, but does claim that the equities in this case require Amoco to bear the full cost of cleanup. However, because both parties are liable under CERCLA, this is a question more properly decided by the district court, after it has determined the proper scope of the cleanup efforts. Accordingly, we REVERSE the judgment and REMAND the case for proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

## ON PETITION FOR REHEARING

PER CURIAM:

Our opinion issued December 8, 1989, 889 F.2d 664, is corrected and clarified as follows:

1) Borden correctly points out, contrary to statements in our opinion, that Amoco rather than Borden offered the "as is" purchase option, which was then accepted by Borden. Additionally, the jury found that Amoco knew or should have known of the property's radioactivity prior to April 16, 1978, whereas we stated that the jury only found that Amoco should have known.

2) Borden correctly points out that Subpart B of the Inactive Tailings Standards applies only to off-pile areas, and then argues that our opinion found it liable because radiation on both the pile and the off-pile sites exceeded Subpart B. Borden therefore requests that we reverse the finding of Borden's liability for the pile itself and limit remand to an allocation of costs for cleaning up the off-pile sites.

We decline to do so. Our opinion did not decide Borden's liability with respect to the areas separately. We considered the 114 acre tract and held that Borden was liable for response costs on the 114 acres because radioactivity on the property exceeded an applicable federal standard, namely Subpart B. This is consistent with the justification standard we established, which is met "if it is shown that *any* release violates ... *any* applicable state or federal standard ..." 889 F.2d at 672. By deciding liability generally, we intended to leave for the district court the specific questions of appropriate cleanup and equitable apportionment of response costs. Those questions must be resolved during the remedial phase of trial after the district court has determined which standards will govern the cleanup efforts.

When the court proceeds, it must consider the EPA's new standards regulating the radioactivity of phosphogypsum piles as well as any other relevant state or federal standards. *See* 54 Fed. Reg. 51, 654 (Dec. 15, 1989). After determining which standard(s) will meet CERCLA's remedial goals, the district court must ascertain the appropriate response costs. Response costs will be warranted only for cleaning up areas containing radioactivity exceeding the relevant standards. If the district court finds that remedial action is not required for the phosphogypsum pile, nothing in our opinion precludes the court from limiting cleanup efforts, and therefore response cost liability, to the off-pile areas.

IT IS ORDERED that the petition for rehearing filed in the above entitled and numbered cause is hereby DENIED.