294 F.3d 482
 In re JOSHUA HILL, INC.
Joshua Hill, Inc.; Marc A. Zaid, Appellants,
v.
Whitemarsh Township Authority; William J. Carmint; George K. Palmer; Richard M. Lam; Christian K. Wagner, As Members of the Whitemarsh
Township Authority Board; Whitemarsh Township; R. Bruce Ferguson; Maryellen Antal; John S. Gabel; Robert Wiser; Chuck Pellegrini, In Their Capacity as Current Members of the Whitemarsh Township Board of Supervisors.
 No. 00-3677.
 United States Court of Appeals, Third Circuit.
 Argued January 15, 2002.
 Filed: June 24, 2002.
 
 1
 Albert G. Bixler, (argued), Eckert Seamans Cherin & Mellott, LLC, Philadelphia, PA, for appellants Joshua Hill, Inc., Marc A. Zaid.
 
 
 2
 Anthony R. Sherr, (argued), Mayers, Mennies & Sherr, LLP, Blue Bell, PA, for appellees Whitemarsh Township Authority, William J. Carmint, George K. Palmer, Richard M. Lam, Christian K. Wagner, As Members of the Whitemarsh Township Authority Board, Whitemarsh Township, R. Bruce Ferguson, Maryellen Antal, John S. Gabel, Robert Wiser, Chuck Pellegrini, In Their Capacity as Current Members of the Whitemarsh Township Board of Supervisors.
 
 
 3
 BEFORE: ALITO, ROTH, Circuit Judges, and SCHWARZER,* District Judge.
 
 OPINION OF THE COURT
 
 4
 SCHWARZER, Senior District Judge.
 
 
 5
 This appeal requires us to determine the meaning and application of the word "release" in the Pennsylvania Hazardous Sites Clean-Up Act, 35 P.S. § 6020.101, et seq. ("HSCA" or "the Act"). Marc A. Zaid and Joshua Hill, Inc. ("plaintiffs") appeal from the District Court's judgment, rendered after a bench trial, in favor of defendants Whitemarsh Township, Whitemarsh Authority, and various Whitemarsh officials (collectively "defendants"). The judgment denied recovery of past response cost and declaratory relief to determine future remedial measures under HSCA. Joshua Hill, Inc. v. Whitemarsh Township Auth., No. Civ.A. 96-5648, 2000 WL 1470534, at *1 (E.D.Pa. Oct.2, 2000) ("DCOp").[1] Because this action was originally filed as an adversary action in the bankruptcy case of Joshua Hill, Inc., we have jurisdiction under 28 U.S.C. § 1334. Appellate jurisdiction exists under 28 U.S.C. § 1291.
 
 I. FACTUAL BACKGROUND
 
 6
 The District Court made extensive findings establishing the following facts, none of which is disputed. Plaintiffs own a parcel of land consisting of approximately 11.36 acres located on Joshua Road in Whitemarsh Township ("the Property"). Zaid purchased the Property from Whitemarsh in 1987 and subsequently conveyed it to Joshua Hill, Inc. The Property has not been developed. From the early 1960s to the early 1970s, Whitemarsh operated the Property as a landfill. The landfill was unlined and operated pursuant to the "trench" method by which trenches were excavated, filled with refuse and covered with soil. It contains approximately 118,000 tons of waste material. In proximity to the Property is a sewage treatment plant operated by Whitemarsh as well as an incinerator formerly operated by Whitemarsh. The incinerator accepted refuse from Whitemarsh, Cheltenham Township, and some commercial entities. When the incinerator was operating, Whitemarsh deposited ash from the incinerator in the landfill. When it was not operating, waste intended to be incinerated was deposited directly into the landfill on the Property. During Whitemarsh's operation of the landfill, officials from the Pennsylvania Department of Environmental Resources ("DER") inspected it periodically. DER inspection reports show disposal of solids, liquids or hazardous wastes without DER approval. Reports also note that incinerator residue, sewage plant, pumping station and household waste were deposited at the landfill. A Whitemarsh employee familiar with the operation of the landfill confirmed that the landfill received incinerator ash, sewage sludge and waste that could not be burned in the incinerator. Sewage sludge and incinerator ash commonly contain concentrated levels of metals left over from the treatment processes. Household and industrial wastes often contain numerous organic chemicals that can be hazardous substances. During the period the landfill operated there was no limit on what substances Whitemarsh residents could set out for curbside waste pickup.
 
 II. HAZARDOUS SUBSTANCES ON THE PROPERTY
 
 7
 Environmental testing conducted over time disclosed the presence of various hazardous substances on the Property. Testing done for National Label Company, owner of an adjacent property, by Quality Control Laboratories ("QC Labs"), revealed the presence of arsenic, barium, cadmium, chromium, lead, silver, acenaphthene, anthracene, 2,4-dimethylphenol, phenol, toluene, ethylbenzene, naphthalene and pyrene in samples from the landfill at the Property. Tests conducted for Whitemarsh by Valley Forge Laboratories of samples from the landfill revealed the presence of barium, lead, mercury, anthracene, pyrene, chrysene, benzo (a) anthracene, benzo (b) fluoranthene, benzo (k) fluoranthene, benzo (a) pyrene, indeno (1,2,3-c,d) pyrene and benzo (g,h,i,) perylene.
 
 
 8
 In 1994, Roy F. Weston, Inc. performed an environmental assessment. Weston drilled five monitoring wells to assess potential groundwater contamination on the Property, monitoring well No. 1 ("MW-1") being the most upgradient well and monitoring wells Nos. 2 and 3 ("MW-2" and "MW-3") being the most downgradient with reference to the landfill. The Weston testing detected elevated levels of PCE and low levels of 1,2-diocholoethene, chloroform, trichloroethene ("TCE"), toluene, ethylbenzene and xylene in MW-1. These tests also detected elevated levels of lead in MW-3. Subsequent testing conducted in 1998 by Blazosky Associates, Inc. ("BAI") found the presence of volatile organic compounds ("VOCs") in MW-1 and lead in monitoring well 4 ("MW-4").
 
 
 9
 At trial, plaintiffs' experts testified that the contaminants found in the groundwater originated from the landfill. Defendants' experts testified to the contrary, stating that materials in the landfill were not impacting the groundwater under the Property and that the PCE found at MW-1 could have come from a dry cleaner located some 4000 feet from the Property.
 
 
 10
 III. THE DISTRICT COURT'S FINDINGS AND CONCLUSIONS
 
 
 11
 The District Court correctly held that to make a prima facie case of liability under HSCA, plaintiffs must establish that:
 
 
 12
 (1) defendants are responsible parties;
 
 
 13
 (2) there has been an actual or threatened "release" of a hazardous substance from a site;
 
 
 14
 (3) "response costs" were or will be incurred; and
 
 
 15
 (4) the response costs were "reasonable and necessary or appropriate."
 
 
 16
 DCOp *8; see United States v. Alcan Aluminum Corp., 964 F.2d 252, 258-59 (3d Cir.1992) (addressing the analogous provisions of section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ["CERCLA"][2]). It found and concluded that materials listed as hazardous materials in 40 C.F.R. § 302.4 are present in the landfill on the Property;[3] that each of the substances detected in the landfill by QC Labs and in the groundwater by Weston and BAI are listed materials; that these substances were probably disposed of, and can be the by-products of waste disposed of at the landfill; and that, accordingly, defendants were owners or operators of a site where a hazardous substance was placed or came to be located, 35 P.S. § 6020.103, and are "responsible" parties within the meaning of HSCA. Id. § 6020.701. DCOp *12.
 
 
 17
 The District Court found, however, that plaintiffs had failed to establish that hazardous substances are being "released into the environment" or that there is "a threat of release." It found, first, that, with the exception of lead and PCE, the levels of chemicals detected had not been shown to be above background levels; second, that the detection of elevated levels of lead is likely the result of laboratory contamination or mistranscription; and, third, with respect to the detection of PCE, if hazardous substances were leaching from the landfill, other VOCs would have been discovered. The Court also found persuasive that for leachate to have migrated to MW-1, it would have had to flow upgradient; that the downgradient wells did not indicate the presence of hazardous substances in detectable quantities or above background levels; and that samples did not reveal the presence of PCE in the landfill. DCOp *12-13.
 
 
 18
 As the District Court put it, "the principal dispute between the parties is whether the Defendants caused a `release' of hazardous substances from a `site.'" DCOp *10. The Court rejected plaintiffs' argument that because hazardous substances were found in the groundwater below the Property, there was a "release" of hazardous substances from the "site." Liability under HSCA, the Court held, is triggered when a hazardous substance is released "from" a "site" rather than "at," "in" or "on" the site. It explained:
 
 
 19
 [T]he plaintiff must show that the hazardous substance is not only present in the "environment" at the site, but also that the hazardous substance made its initial entrance into the "groundwater,... land surface or subsurface strata" at some location on that property.
 
 
 20
 DCOp *10. Having failed to prove that a release or threatened release occurred, the Court concluded, plaintiffs are not entitled to relief under HSCA. DCOp *12.
 
 
 21
 Because the District Court's findings of fact are not challenged on this appeal and we review only its legal conclusions with respect to the interpretation and application of HSCA, our review is plenary. Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV, 229 F.3d 245, 250 (3d Cir.2000).
 
 IV. RELEASE
 HSCA provides that
 
 22
 a person shall be responsible for a release or threatened release of a hazardous substance from a site when
 
 
 23
 (1) The person owns or operates the site:
 
 
 24
 (i) when a hazardous substance is placed or comes to be located in or on a site; (ii) when a hazardous substance is located in or on the site but before it is released;
 
 
 25
 § 6020.701.
 
 
 26
 The District Court held that plaintiffs had failed to prove "a Release or Threatened Release From the Landfill Into the Environment." DCOp *12. We think that the District Court misconstrued "release." We conclude that the plaintiffs have fulfilled the requirement of showing a "release from a site" because placing hazardous materials in an unlined landfill is in itself a "release." We turn first to the text of the Act. "Release" is defined to include "dumping or disposal into the environment." § 6020.103. "Disposal" is further defined to include "[t]he combustion, ... deposition, ... dumping, ... or placing of a hazardous substance or contaminant into the air, water or land in a manner which allows it to enter the environment." Id. Thus, when section 701 is read in context with the statutory definitions, it takes on broader scope than the District Court gave it, imposing responsibility on the owner or operator of a "site" for "placing a hazardous contaminant ... into the land in a manner which allows it to enter into the environment." "Environment" is defined as "surface water, groundwater, drinking water supply, land surface or subsurface strata or ambient air." Id. Dumping hazardous materials into an unlined landfill constitutes placing such materials into the land in a manner that allows them to enter the environment. Indeed, as the District Court recognized, the site itself is a part of the "environment." DCOp *10. The Act draws no distinction between the environment at the dump site and the environment elsewhere on the Property and, hence, does not require a plaintiff to prove that such materials actually migrated from the landfill.
 
 
 27
 The District Court focused narrowly on whether there had been a "Release ... From the Landfill Into the Environment." DCOp *12. In doing so, it failed to take into account that under the Act's definition the relevant site includes not only a landfill, but also an "area where a contaminant or hazardous substance has been deposited... released, disposed of, placed or otherwise come to be located." § 6020.103. In other words, the entire Property constitutes the site. Suppose defendants had dumped contaminants elsewhere on the Property other than in the landfill. Under the District Court's interpretation, defendants would not be responsible unless plaintiffs proved that the contaminants they dumped were "released into the environment" by migrating elsewhere on site or onto adjoining property. Such an interpretation would eviscerate the Act.
 
 
 28
 In requiring plaintiffs to prove that the hazardous substance "made its initial entrance into the `groundwater, ... land surface or subsurface strata' at some location on that property," the District Court relied heavily on the Act's use of the word "from," rather than "at," "in," or "on." DCOp *10. It reasoned that the Act's language implied that "the initial release into the environment of a hazardous substance found ... at a particular site have[sic] actually occurred at that site." Id. This requirement is at odds with the broad sweep of the Act under which a release occurs when hazardous material is dumped at the landfill in a manner which allows it to enter the environment, i.e., the land, water or air. In our view, when the hazardous materials were dumped at the unlined landfill, they were dumped in a manner that allowed them to enter the environment — at the very least, the environment comprising the landfill. No further proof was required that they migrated from there. Our conclusion finds further support in the definition of "release," which includes "the abandonment or discarding of barrels, containers, vessels and other receptacles containing a hazardous substance or contaminant." § 6020.103. If abandonment of barrels qualifies as a release into the environment, then, surely, dumping of hazardous materials into a landfill does as well.
 
 
 29
 The District Court's literal reading of the word "from" is thus incompatible with the plain meaning and purpose of the Act. A more natural reading consistent with the Act's text and purpose would find a release "from" the site when hazardous waste is dumped so as to "allow [] it to enter into the environment" without the need to prove that it actually migrated from the site. § 6020.103 (defining disposal). This reading is consistent with language found later in the same section that provides exceptions from responsibility for an "owner [who] obtained actual knowledge of the release or threatened release of a hazardous substance at the site." § 6020.701(b)(1)(iv) (emphasis added). It is also consistent with section 701(a)(2) imposing responsibility for a release when a "person generates ... a hazardous substance and arranges ... for the disposal... of the hazardous substance." Id. This provision plainly equates release with disposal of hazardous substances by the person who generated them. As such, it also provides an alternative basis for imposing liability on defendants as generators of hazardous waste, because defendants operated a sewage treatment plant and trash incinerator near the Property and deposited hazardous waste from the plant and the incinerator in the landfill.
 
 
 30
 The District Court's reasoning is also at odds with the statutory scheme which imposes both strict and joint and several liability. Section 6020.1109 creates a presumption that a person who allows a release of a hazardous substance shall be liable for all contamination within 2500 feet of the perimeter of the area where the release has occurred. 35 P.S. § 6020.1009. This presumption may be overcome only by clear and convincing evidence that the person charged did not contribute to the contamination. The District Court's requirement that plaintiffs demonstrated that the contaminants on the Property leached from the landfill effectively disregards and negates the presumption. Its implicit rejection of the presumption on the ground that plaintiffs had failed to prove a release is circular and ignores the broad scope the Act gives to the term "release." DCOp *10. The District Court's reasoning is also at odds with the Act in that it implies that liability may be precluded because some of the contaminants on the Property may have come from a source other than the landfill. In order to impose strict liability for damage, it is sufficient that a release significantly contributes. 35 P.S. § 6020.702(a). To the extent that persons other than defendants may share responsibility for the contamination on the Property, the Act affords defendants a right to seek contribution from responsible persons. 35 P.S. § 6020.705.
 
 
 31
 We conclude that the District Court's interpretation, which would immunize persons who dumped hazardous materials at a landfill unless those materials are shown to have entered the soil or groundwater at the dump site, is not supported by the text of the Act, is inconsistent with its plain meaning, and conflicts with the Act's stated purpose to "[p]rotect the public health, safety and welfare ... from the short-term and long-term effects of the release of hazardous substances and contaminants into the environment." 35 P.S. § 6020.102(12)(vi).
 
 
 32
 Our conclusion finds support in decisions of various courts interpreting the analogous provision of CERCLA.[4] In Amoco Oil Co. v. Borden, Inc., 889 F.2d 664 (5th Cir.1990), the court, stating "that the definition of release should be construed broadly," held that Borden's actions "met the release requirement in two ways. First, it did so by disposing of the (hazardous wastes) on the property.... Second, the gas emanating from the [waste] constitutes a release within the meaning of the statute." Id. at 669. District courts in our Circuit have adopted the same interpretation. United States v. Barkman, Nos. CIV.A. 96-395 and CIV.A. 98-1180, 1998 WL 962018, at *8 (E.D.Pa. Dec.7, 1998) (rejecting defendants' arguments that plaintiff must prove that defendants' waste was the contamination source and finding that a release had occurred where hazardous substances were present at the site and in the surrounding groundwater and soils); Bethlehem Iron Works, Inc. v. Lewis Indus., Inc., No. CIV.A. 94-0752, 1996 WL 557592, at *50, *64 (E.D.Pa. Oct.1, 1996) (applying both CERCLA and HSCA, finding a release established where the evidence showed contamination of the groundwater at the site and of the soil on the property and dumping of drums containing hazardous materials on the property such that plaintiffs were not required to prove who was responsible for the release at the site); Artesian Water Co. v. New Castle County, 659 F.Supp. 1269, 1282 (D.Del.1987) aff'd, 851 F.2d 643 (3d Cir. 1988) (stating that plaintiff was not required to prove that contaminants found near the site actually flowed from the site); see also HRW Sys., Inc. v. Washington Gas Light Co., 823 F.Supp. 318, 338 (D.Md.1993) (suggesting that activity producing hazardous waste on the site constitutes a release).
 
 
 33
 Stewman v. Mid-South Wood Prods. of Mena, Inc., 993 F.2d 646 (8th Cir.1993), cited by the District Court, is not to the contrary. Plaintiffs had brought a negligence action against the defendants, owners of adjoining property on which hazardous wastes had been deposited, alleging that hazardous materials had been released from the adjoining property onto theirs. Id. at 647. Expert testimony at trial established that the contaminants found on plaintiffs' properties were naturally occurring substances and that there had been no release from the defendants' property. The district court found as a factual matter that there had been no release and the court of appeals held that the finding was not clearly erroneous. Id. at 648. Thus, unlike the present case, the issue in Stewman was the sufficiency of the proof of causation, not the interpretation of the statutory term "release."
 
 V. RESPONSE COSTS[5]
 
 34
 Plaintiffs sought response costs under sections 6020.702(a)(3) and 6020.507(a) of the Act, which provide that, "[A] responsible person under section 701 or a person who causes a release ... of a hazardous substance ... shall be liable for the response costs." 35 P.S. § 6020.507(a); 35 P.S. § 6020.702(a)(3). Because plaintiffs have established that defendants are responsible persons who caused a release, they are entitled to relief under the Act.
 
 
 35
 Plaintiffs sought to recover costs incurred to investigate, test for, and assess the presence of hazardous substances at the Property. These costs cover testing done by Valley Forge Laboratories ($7,225.00), Kaselaan & DeAngelo Associates ($2,785.00), and Spires Engineering Company ($4,290.48). In addition, Zaid claimed $26,250 for time spent in connection with environmental testing and investigating matters. DCOp *8. The District Court disallowed these costs because they were incurred "for potential development [of the Property], not in order to respond to or remedy a potential environmental hazard." DCOp. *13.
 
 
 36
 Response includes "action taken in the event of a release ... to study [and] assess... the release in order to protect the present or future public health, safety or welfare of the environment," § 6020.103, and response costs include "reasonable and necessary or appropriate costs," § 6020.702(a)(3). The District Court did not find that these costs were not "reasonable and necessary or appropriate."
 
 
 37
 Nothing in the Act precludes recovery of otherwise "reasonable and necessary or appropriate" response costs simply because they are incurred in connection with plans for property development. Indeed, it can reasonably be expected that plans for development will generally provide the impetus for incurring response costs. District courts have consistently ruled under the analogous provisions of CERCLA that plaintiffs who were initially motivated by a desire to sell the property are not precluded from recovering otherwise reasonable and necessary response costs.[6] Darbouze v. Chevron Corp., No. CIV.A. 97-2970, 1998 WL 512941, at *7, *10 (E.D.Pa. Aug.19, 1998) (involving HSCA and CERCLA); BCW Assocs. Ltd. v. Occidental Chem. Corp., No. CIV.A. 86-5947, 1988 WL 102641, at *17 (E.D.Pa. Sept.29, 1988); Hatco Corp. v. W.R. Grace & Co., 849 F.Supp. 931, 963-64 (D.N.J.1994); Channel Master Satellite Sys., Inc. v. JFD Elecs. Corp., 748 F.Supp. 373, 379 n. 7 (E.D.N.C.1990). Moreover, courts have held under the analogous provisions of CERCLA that the types of activities undertaken by plaintiffs — investigating and assessing the presence of hazardous substances — result in recoverable response costs. Darbouze, 1998 WL 512941, at *6-*7, *10 (awarding costs for investigating presence of hazardous substances on property under CERCLA and HSCA); see Fallowfield Dev. Corp. v. Strunk, No. 89-8644, 1990 WL 52745, 1990 U.S.Dist. LEXIS 4820, at *11 (E.D.Pa. April 23, 1990) (finding that costs related to testing and evaluating the contamination constitute recoverable costs under CERCLA); Wickland Oil Terminals v. Asarco, Inc., 792 F.2d 887, 892 (9th Cir.1986) (holding that no distinction exists between investigatory costs and on-site clean-up costs for purposes of recovery); In re Allegheny Int'l Inc., 126 B.R. 919, 926 (W.D.Pa.1991) (finding that expenses incurred for monitoring a waste site and developing a cleanup plan are recovery costs); Artesian, 659 F.Supp. at 1288 (adopting the reasoning of Wickland and allowing recovery of evaluation and monitoring costs). Accordingly, plaintiffs are entitled to recover as past response costs payments to Valley Forge Laboratories, Kaselaan & DeAngelo Associates, and Spires Engineering Company.
 
 
 38
 With respect to Zaid's claimed expenses of $26,250.00 for his time, they, too, are recoverable as labor costs. Cf. T&E Industries, Inc. v. Safety Light Corp., 680 F.Supp. 696, 707 (D.N.J.1988) (holding that CERCLA permits recovery of labor costs incurred in responding to radiation containment). However, these expenses are currently insufficiently documented to be awarded. As the District Court noted, "there is no evidence supporting this claim aside from Zaid's recollection." DCOp *13 n. 10. On remand, further documentation should be provided to the District Court to substantiate this amount.
 
 
 39
 The District Court also determined that plaintiffs sought $10,063.69 in litigation costs[7] and denied them. DCOp. *13. Whether litigation costs are recoverable depends on the statutory basis for the claim. The Pennsylvania Supreme Court has held that the citizen suit provisions of HSCA permit recovery of attorney fees. Section 6020.1115(b) provides that a court in a private citizen suit "may award litigation costs, including reasonable attorney and witness fees, to the prevailing ... party." Redland Soccer Club, Inc. v. Dep't of the Army of the United States, 548 Pa. 178, 696 A.2d 137, 147 (1997). On the prior appeal in this case, we held that plaintiffs' complaint set forth a private cause of action for response costs, and not a citizen suit. On that basis, we rejected defendants' contention that advance notice was required to assert the present claim. Joshua Hill, Inc., slip op. at 9-10. This case, therefore, is a private action for response costs under sections 702 and 1101 of HSCA; section 1115(b), which permit recovery of litigation costs in citizen suits, is inapplicable. While the Pennsylvania Supreme Court has not squarely addressed the question whether litigation costs are recoverable under section 702, we think that Redland Soccer Club strongly indicates that the court would hold that they are not. Comparison of the language of the two statutes also supports that result. Section 702 contains no provision comparable to section 1115(b), and nothing in the definition of response in section 103 is susceptible to being interpreted as including litigation. Accordingly, we affirm the District Court's denial of plaintiffs' litigation costs.
 
 VI. CONCLUSION
 
 40
 We hold that defendants' disposal of hazardous substances at a landfill constitutes a release into the environment within the meaning of section 701 of HSCA and makes them responsible parties, liable to plaintiffs for response costs pursuant to sections 702 and 507 of the Act. Plaintiffs are entitled to recover the response costs previously incurred in the amount of $14,300.48, but not their litigation costs of $10,063.69. We remand for further documentation of Mr. Zaid's requested expenses. Finally, plaintiffs are entitled to a determination on remand of the prospective costs of response shown to be reasonable and necessary or appropriate. Accordingly, we REVERSE the judgment and REMAND for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 *
 The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 All claims other than the HSCA claim were previously dismissed and the dismissal was affirmed by this court in an unpublished memorandum,Joshua Hill, Inc. v. Whitemarsh Township Auth., No. 97-1588, slip op. 1, 151 F.3d 1025 (3d Cir. Apr.28, 1998).
 
 
 [2]
 42 U.S.C. § 9607
 
 
 [3]
 Under HSCA, a "hazardous substance" includes "[a]ny element, compound or material which is ... defined or designated as a hazardous substance pursuant to [CERCLA]." 35 P.S. § 6020.103. The elements and compounds designated as hazardous substances under section 102(a) of CERCLA are listed at 40 C.F.R. § 302.4
 
 
 [4]
 CERCLA imposes liability on an owner or operator of a facility "from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance." 42 U.S.C. § 9607(a)
 
 
 [5]
 The District Court ruled on plaintiffs' request for costs "assuming arguendo that a release occurred from the landfill." DCOp *13
 
 
 [6]
 CERCLA provides that where a release of a hazardous substance causes the incurrence of response costs, the responsible party shall be liable for "any ... necessary costs of response incurred by any ... person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). HSCA does not condition liability on costs being consistent with the national contingency plan
 
 
 [7]
 The costs included charges from Blazosky Associates, Inc. ($8,994.26), Chemspec Analytical Laboratories ($890.00), and Tetrahedron Consultants, Inc. ($179.43)