UNITED STATES of America, Plaintiff

v.

UNITED NUCLEAR CORPORATION,
Defendant.

No. CIV 91–983 JC/WWD.

United States District Court,
D. New Mexico.

Dec. 28, 1992.

John Zavitz, Asst. U.S. Atty., U.S. Atty.'s Office, Albuquerque, NM, Barry M. Hartman, U.S. Dept. of Justice, Environment & Natural Resources Div., Sean Carman, David Fishel, U.S. Dept. of Justice, Environmental Enforcement Section, Washington, DC, for plaintiff.

Michael W. Brennan, Stephen J. Lauer, Carpenter, Comeau, Maldegen, Brennan, Nixon & Templeman, Santa Fe, NM, Ridgway M. Hall, Crowell & Moring, Washington, DC, for defendant.

## MEMORANDUM OPINION

CONWAY, District Judge.

THIS MATTER came on for the consideration of Plaintiff's Motion for Partial Summary Judgment on the Issue of Liability, filed May 18, 1992 and Defendant's Cross Motion for Summary Judgment, filed July 10, 1992. This Court heard oral argument on Friday, December 11, 1992 and has reviewed the motions, memoranda and exhibits submitted by the parties. For the reasons which follow, the Court finds that the Plaintiff's Motion for Partial Summary Judgment is well-taken and will be granted. The Court further finds that Defendant's Cross Motion for Summary Judgment is not well-taken, and will be denied.

## I. BACKGROUND

### A. Site History

The Church Rock Uranium mine, which is the subject of this action, is located approximately 16 miles northeast of Gallup, New Mexico. United Nuclear first opened the mine in February of 1968, with ore production beginning in June of 1969. Initially, the extracted ore was transported by truck to a uranium mill, owned by Kerr–McGee Corporation, for processing. In 1976, United Nuclear applied for a license to open its own milling plant at the site. The United Nuclear mill began operations in June of 1977, and has a maximum operating capacity of 4000 tons of ore per day.

As a byproduct of the uranium milling process, mine tailings were produced. Mine tailings are a mixture of solid milling wastes, water and chemicals used in the milling process. The Church Rock tailings, which contain radioactive as well as other hazardous materials, are contained in tailings ponds. These ponds are designed to facilitate evaporation of the liquid portion of the tailings. Upon cessation of milling operations, and after full evaporation has occurred, the remaining tailings are to be covered with "clean" dirt and revegitated as part of the mine's reclamation process. The present action arises due to seepage of liquid, containing hazardous materials, out of the ponds and into various subterranean aquifers, including the upper portions of the Gallup aquifer which provides drinking water for at least some residents of the area.

### B. Licensing of the Facility

The site was initially governed by a license issued by the New Mexico Environmental Improvement Division, under a delegation of authority from the Nuclear Regulatory Commission (NRC) pursuant to the Atomic Energy Act. Regulation of the site was returned to the NRC in 1986. The site is currently under a NRC license. The Environmental Protection Agency (EPA) began initial investigation and monitoring of the site in the early 1980's, and issued a final record of decision in September of 1988. In August of 1988, EPA entered into a Memorandum of Understanding with NRC to jointly monitor and regulate the cleanup of hazardous emissions from the site. Finally, in September of 1991, EPA filed this cost recovery action against United Nuclear.

### C. Introduction to CERCLA

The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 *et seq.*), now popularly known as CERCLA, was passed in the final hours of the Ninety–Sixth Congress and then signed into law, by President Carter, on December 11, 1980. The purpose of the Act was to provide a "means for cleaning up hazardous waste sites and spills" and is "generally known to the public as authorizing the so-called Superfund, the $1.6 billion Hazardous Substances Response Trust Fund." *State of New York v. Shore Realty Corp.*, 759 F.2d 1032 (2nd Cir.1985).

CERCLA provides authority for the President to respond to the release of "hazardous substances" and "pollutants and contaminants" which pose "an imminent and substantial danger to the public health or welfare". 42 U.S.C.A. § 9604(a)(1) (West 1983 & Supp. 1992). Enforcement of CERCLA is broadly grouped into either "removal" or "remedial" actions. *Id.* The President may not, however, initiate a remedial or removal action

> [I]n response to a release or threat of release—
>
> (A) of a naturally occurring substance in its unaltered form, or altered solely through naturally occurring processes or phenomena, from a location where it is naturally found;
>
> (B) from products which are part of the structure of, and result in exposure within, residential buildings or business or community structures; or
>
> (C) into public or private drinking water supplies due to deterioration of the system through ordinary use.

*Id.* § (a)(3). However, "[n]ot withstanding paragraph (3) of this section, to the extent authorized by this section, the President may respond to any release or threat of release if in the President's discretion, it constitutes a public health or environmental emergency

and no other person with the authority and capability to respond to the emergency will do so in a timely manner." *Id.* § (a)(4). The President's authority to respond under CERCLA has been delegated to the Environmental Protection Agency (EPA).

The Tenth Circuit has provided a fairly concise summary of the function of the CERCLA statutory scheme.

> Section 111 of CERCLA provides for the creation of a Hazardous Substance Superfund to finance cleanup actions at sites affected by releases or threatened releases of hazardous substances. 42 U.S.C. § 9611. Section 104(a) authorizes the federal government to take necessary cleanup actions financed by the Superfund to respond to such releases or threatened releases. 42 U.S.C. § 9604(a). Alternatively, under § 104(d), the federal government may enter into cooperative agreements with states, political subdivisions or Indian Tribes to conduct cleanup actions using the Superfund. 42 U.S.C. § 9604(d).
>
> To shift the financial burden of a cleanup to the parties responsible for the releases, a governmental entity may sue these parties for the costs incurred in responding to a release.... When a cost recovery action is brought by the federal government, a state, an Indian Tribe or a private party, § 107(a)(4) imposes liability on responsible parties for response costs "not inconsistent with the national contingency plan [NCP]." 42 U.S.C. § 9607(a)(4). The NCP consists of procedural and substantive guidelines issued by the Environmental Protection Agency (EPA) governing CERCLA cleanup actions.

*State of Colorado v. Idarado Mining Co.,* 916 F.2d 1486, 1488–89 (10th Cir.1990).

## II. LIABILITY UNDER CERCLA

■ In the instant case, EPA is seeking to recover the costs of response actions taken at the Church Rock facility. To establish a prima facie case of liability under CERCLA, the EPA must satisfy a four part test. In short, the Agency must prove,

> (1) that the site in question is a "facility" as defined in § 9601(9); (2) that the defendant is a responsible person under

§ 9607(a); (3) that a release or a threatened release of a hazardous substance has occurred; and (4) that the release or threatened release has caused the plaintiff to incur response costs.

*Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir.1989). Liability under CERCLA is strict, so once each element of the above test has been established, plaintiff is entitled to summary judgment on the issue. This is true even where a genuine issue exists as to the appropriate damages. *Id.* In effect, a bifurcated determination is made, where the plaintiff establishes liability as a matter of law on summary judgment, and then goes to trial to determine damages. *See id.*

### A. Facility

The term "facility" is defined in 42 U.S.C.A. § 9601(9) (West Supp.1992) to mean,

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

The parties agree that the United Nuclear Church Rock facility constitutes a "facility" for purposes of CERCLA.

### B. Responsible Person

Section 9607(a) provides that for purposes of CERCLA, liability will be assessed against the following person(s):

> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treat-

ment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance

Such responsible persons are liable for,

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

*Id.* For purposes of these motions, the parties agree that United Nuclear was and is the owner of the Church Rock site, and therefore a responsible party as defined by this section. As will be discussed more fully below, United Nuclear disagrees that it is liable for the costs of actions taken by the United States Government with regard to the Church Rock facility.

*C. Release or Threatened Release*

A release is defined in 42 U.S.C. § 9601(22) to mean

[A]ny spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment ... but excludes (A) any release which results in exposure to persons solely within the workplace, with respect to a claim which such persons may assert against the employer of such persons, (B) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine, (C) release of source, byproduct, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954 [42 U.S.C. § 2011 et seq.], if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under section 170 of such Act [42 U.S.C. § 2210], or, for the purposes of section 9604 of this title or any other response action, any release of source byproduct, or special nuclear material from any processing site designated under section 7912(a)(1) or 7942(a) of this title, and (D) the normal application of fertilizer.

Whether a release has occurred at the Church Rock site has been twice litigated, by United Nuclear, in conjunction with litigation regarding the propriety of EPA's placement of the site on the National Priorities List (NPL).

United Nuclear's Church Rock facility was placed on the NPL in 1983. The NPL is a listing of sites where releases or threatened releases of hazardous substances exist. The NPL is of paramount importance to EPA because in order for EPA to expend funds from the Superfund, the site of the release or threatened release must first be placed on the NPL. Once the listing has occurred, EPA is authorized to utilize Superfund monies for response and remedial actions.

United Nuclear has twice challenged the EPA's listing of the Church Rock facility in the United States Court of Appeals for the D.C. Circuit. *See Eagle–Picher Industries v. United States Environmental Protection Agency,* 759 F.2d 922 (1985) (*Eagle–Picher I*) and *Eagle Picher Industries v. United States Environmental Protection Agency,* 822 F.2d 132 (1987) (*Eagle–Picher II*).

1. Eagle–Picher I

In *Eagle–Picher I,* United Nuclear, and several other companies, challenged the inclusion of their sites on the national priority list. The argument made by the companies

had two prongs. First, the companies asserted that the mining wastes were not "hazardous substances" within the meaning of CERCLA. Second, the companies asserted that EPA could not include sites on the NPL which were regulated pursuant to licenses issued under the authority of the Nuclear Regulatory Commission.

### a. Hazardous Substance

■ The companies' argument that mining wastes were not hazardous substances under CERCLA was based on 42 U.S.C. § 9601(14) which, in relevant part, defines a hazardous substance to be,

(C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C. 6904 *et sec.*] *has been suspended by Act of Congress*)

(emphasis added). The petitioners argued that this section specifically excludes mining waste, which Congress has suspended from regulation under the Solid Waste Disposal Act. *See Eagle–Picher I*, 759 F.2d at 926. In furtherance of their argument, the companies stated that Congress could not have intended for mining wastes to fall under CERCLA. The companies asserted that all mining wastes contain trace amounts of substances which are defined as hazardous under CERCLA, but in general, the amounts of these substances are so small that they do not present a hazard to the public. In fact, the companies asserted that the background (naturally occurring) levels of certain of these substances were higher than the amounts contained in the mining wastes. Based on the fact that such low levels of contaminants are typically contained in mining wastes, the companies argued that Congress intended the mining wastes to be exempt from CERCLA.

The court of appeals found that Congress had not intended to remove mine wastes from the purview of CERCLA stating, "Had Congress intended to exempt mining wastes and fly ash from the entirety of section 101(14), it obviously could have placed the exemption at the beginning or end of the section, not in one of the several subparagraphs." *Id.* at 927. The court went on to say that

It is quite possible that Congress was unconvinced that enough was known about mining wastes and fly ash for EPA to decide that those substances, as a general rule, posed a threat to the environment, but at the same time Congress may have been willing to bring any mining wastes and fly ash found to contain "hazardous substances" within the ambit of section 101(14).

*Id.* at 928. In the end, the court determined that even if *arguendo* the section excluded mining wastes from the definition of hazardous substances, that the wastes could still be considered "pollutants or contaminants" and thereby permit the inclusion of the sites on the NPL. *Id.* at 932. The distinction between "hazardous substance" and "pollutants or contaminants" is not important for purposes of the NPL, but is critical for purposes of a cost recovery action. An owner of land may not be liable for the clean-up costs of pollutants or contaminants, but is liable for the costs incurred to clean up hazardous substances. *Id.*

Several cases have held that the definition of a hazardous substance found in CERCLA (42 U.S.C.A. § 9601(14)) is not in any way dependant on the amount of substance released. *See e.g., United States of America v. Alcan Aluminum Corp.*, 964 F.2d 252, 260 (3rd Cir.1992) ("Hence, the statute does not, on its face, impose any quantitative requirement or concentration level on the definition of 'hazardous substances.' Rather, the substance under consideration must simply fall within one of the designated categories."); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir.1989) ("The plain statutory language fails to imply any quantitative requirement on the term hazardous substance and we decline to imply that any is necessary. Radionuclides meet the listing requirements and therefore the radioactive materials on Amoco's property are hazardous substances within the meaning of CERCLA."); *City of New York v. Exxon Corp.*, 744 F.Supp. 474, 483 (S.D.N.Y.1990) ("Nevertheless, we are

satisfied that liability under CERCLA attaches regardless of the concentration of the hazardous substances present in defendant's waste, so long as the defendant's waste and/or the contaminants in it are 'listed hazardous substances' pursuant to 40 C.F.R. § 302.4(a).". 40 C.F.R. § 302.4 contains an extensive table which lists all hazardous substances included under CERCLA.

By United Nuclear's own admission, the mine tailings contain various substances, some in trace amounts, which have been designated as hazardous substances for purposes of CERCLA. Based on the reasoning contained in the above decisions, there seems little doubt that the mine tailings should be treated as hazardous substances rather than pollutants or contaminants.

### b. NRC Licensed Facility

In the second prong of its attack, United Nuclear asserted that the Church Rock facility could not be placed on the NPL because the site was under the exclusive regulation of the Nuclear Regulatory Commission pursuant to the Atomic Energy Act of 1954 (AEA), 42 U.S.C. §§ 2011 *et seq.* Under the strictures of the AEA, the NRC has the option of either directly licensing nuclear facilities, or delegating authority to the states to regulate in-state facilities. NRC has utilized both of these regulatory schemes with regard to the Church Rock site. When United Nuclear first applied for its uranium milling license in 1976, the state of New Mexico's Environmental Improvement Division had been given the authority to regulate nuclear facilities in New Mexico.

Licensing authority was subsequently relinquished to the NRC in June of 1986. EPA generally follows a hands-off policy with regard to facilities directly regulated by the NRC. In contrast, however, EPA policy dictates the monitoring of facilities which are regulated by states pursuant to NRC authority. This hands-on approach to state licensed facilities was the subject of United Nuclear's attack. EPA based its policy distinction between state licensed and NRC licensed facilities on the speed with which a federal response could be brought to bear if a release should occur.

When a facility is licensed by a State pursuant to an NRC delegation, the NRC has no authority, short of withdrawing the delegation itself, to enforce conditions of the license or determine that new conditions are necessary. EPA recognizes that the licensing State may be able to ensure cleanup of any release through the license, but has decided to list such sites on the NPL to provide potential Federal authorities if necessary.

*Eagle–Picher I,* 759 F.2d at 922 (*citing* the final promulgation of the NPL, 48 Fed.Reg. 40658, 40662 (1983)). The D.C. Circuit agreed with the EPA policy, stating

Congress specifically limited EPA's power under CERCLA to regulate certain radioactive releases. Congress did not, however, choose specifically to exclude sites such as petitioners', nor did Congress place any other limitation on EPA's power to list sites regulated by other, nonfederal governmental entities. Except for specific limitations, EPA enjoys the power to list *any* site where there is a release of threatened release of a hazardous substance, pollutant or contaminant. We find nothing in CERCLA limiting EPA's authority to regulate mill tailings facilities.

*Eagle–Picher I,* 759 F.2d at 934 (emphasis in original). With regard to United Nuclear's argument that EPA had provided no rational explanation for choosing to regulate sites operating under delegated NRC authority, but not to regulate sites operating under direct NRC authority, the circuit stated, "In our view, it was reasonable for EPA to decide that the NRC would encounter greater difficulty in withdrawing a delegation of authority and responding than would EPA in responding under CERCLA." *Id.*

### 2. Eagle–Picher II

In a related case, argued the same day as *Eagle–Picher I,* several companies argued against the inclusion of five sites (including the Church Rock site) on the NPL. This argument was based on the substantive conclusions reached by EPA in its Hazardous Ranking System Evaluation of each site. *See Eagle–Picher Industries v. United States Environmental Protection Agency,* 822 F.2d

132, 136–37 (D.C.Cir.1987) (*Eagle–Picher II*).

The Hazard Ranking System entails: (1) consideration of three pathways—groundwater, surface water, and air—by which hazardous substances reach the environment, 40 C.F.R. pt. 300, App. A, § 1.0 (1985); (2) estimation of the likelihood that waste from the site will migrate into the environment via these pathways, *id.* §§ 3.0–3.3, 4.0–4.3, 5.0–5.1; (3) evaluation of the waste characteristics, including toxicity, persistence, and hazardous waste quantity, *id.* §§ 3.4, 4.4, 5.2; (4) and calculation of the potential human and environmental targets of the contamination, *id.* §§ 3.5, 4.5, 5.3.

*Id.* at 136, fn. 5. The D.C. Circuit analysis of EPA's conclusions was based on the premise that the court could not interfere with the National Priorities List unless it found that EPA's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 137, fn. 7.

EPA listed the Church Rock facility as violating all three pathways, groundwater, surface water and air. *Id.* at 149. United Nuclear challenged the listing of all three pathways. With regard to the groundwater listing, United Nuclear contended that EPA miscalculated the "potential human targets" by overestimating the population utilizing the effected wells. *Id.* at 149. The court found, however, that EPA's analysis and conclusions were rational and therefore refused to disturb them. *Id.* at 150.

EPA's basis for including the surface water pathway was a spill of at least 93 million gallons of tailings fluid which occurred in 1979. *Id.* The court rejected United Nuclear's claim that since the spill had been cleaned up it should no longer be considered for purposes of the hazardous ranking analysis. *Id.*

Finally, based on its previous decision in *Eagle–Picher I*, the court rejected United Nuclear's argument that the release by air should not be included due to the small concentrations of uranium released. *Id.* at 151. As discussed *supra*, the *amount* of hazardous substance released is irrelevant for purposes of CERCLA.

## D. Response Costs

■ United Nuclear claims that EPA has failed to satisfy the fourth prong of the test because any response costs which were incurred were not consistent with the NCP. As will be discussed more completely *infra*, United Nuclear, from the beginning, has protested the activities EPA has undertaken at the site. In large part, United Nuclear's protest stems from the assertion that the company was already conducting adequate monitoring of the property, and had implemented a plan which was no different than the remedial program ultimately ordered by EPA. United Nuclear therefore argues that any action taken by EPA was duplicative, and therefore inconsistent with the NCP.

From the facts asserted by the parties, it is clear that the necessity of EPA's actions is a disputed issue of fact. United Nuclear argues that pursuant to the Tenth Circuit's holding in *County Line Investment Co. v. Tinney*, 933 F.2d 1508 (10th Cir.1991), the consistency of EPA's costs with the NCP is part of the prima facie case necessary to establish liability under CERCLA. The *Tinney* decision is not applicable to the facts at issue for two reasons.

First, and most importantly, in *Tinney* a private party was seeking recovery under CERCLA, whereas in the present case, EPA is seeking to recover. Section 9607(a) provides that under CERCLA a governmental agency can recover "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan." In contrast, a private party may only recover "any other necessary costs of response incurred by any other person consistent with the national contingency plan." Congress clearly intended to differentiate between the remedies available for a private party and those available for a governmental entity. The Tenth Circuit's holding specifically applied to a private party action brought under CERCLA. *See County Line Investment Co. v. Tinney*, 933 F.2d at 1512 ("Proof of response costs incurred "consistent with" the NCP is, therefore, an ele-

ment of a prima facie *private cost recovery action* under CERCLA.") (emphasis added).

A private party is limited to recovery of "any other necessary costs of response" 42 U.S.C.A. § 9607(a), whereas a governmental entity or Indian tribe is allowed recovery for "all costs of removal or remedial actions" *id.* EPA's scope of recovery was clearly intended to be much broader in nature than the recovery allowed by a private party. The *Tinney* decision recognizes this decision by placing a higher burden on a private party to establish liability under CERCLA.

The second distinction between the *Tinney* case and the case at bar is based on the actions undertaken by the various parties. The Tenth Circuit was clearly concerned in *Tinney* with the propriety of the actions taken by the new owners of the landfill. EPA had investigated the site, and had decided not to take action. *County Line Investment Co. v. Tinney*, 933 F.2d at 1510. Specifically, the Tenth Circuit found that the real question before the district court "was not 'how much' damage had plaintiffs suffered, but rather, whether the type of damages alleged was remedial by way of CERCLA." *Id.* In contrast, the question before this Court is not whether the *type* of damages contemplated by CERCLA exist, but rather the *amount* of recovery available to EPA.

The question here is to what extent EPA can recover response costs from United Nuclear. Under the CERCLA statutory scheme pertaining to governmental action, this question should necessarily be determined in the damages phase of this litigation. *See Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir.1989) discussed *supra.* In contrast to a private party which does not have a check on its behavior, and therefore must show that its actions were "necessary" to establish CERCLA liability, EPA is required to establish the necessity of its actions up front by following the procedures required to place a site on the NPL. In this situation EPA evaluated the Church Rock site and determined that a response action was necessary. EPA followed the proper statutory procedure by placing the site on the NPL. Furthermore, the D.C. Circuit

has twice found that EPA had the authority to place the site on the NPL. *See Eagle–Picher I* and *Eagle–Picher II* discussed *supra.*

It is clear from the record that EPA has expended funds at the Church Rock facility in response to the release of a hazardous substance. EPA has already shown that it was entitled to take action at the Church Rock site by establishing the statutory requirements necessary to place the Church Rock site on the NPL and has twice defended its actions in the D.C. Circuit. The dispute over the amount recoverable should not preclude a finding of liability in this situation. Any inconsistency between EPA's expenditures and the NCP can be used by United Nuclear to limit the amount of damages collected by EPA. *See Amoco Oil Co. v. Borden,* discussed *supra.*

## III. UNITED NUCLEAR'S DEFENSES

### A. Statute of Limitations

1. "Response" or "Remedial" Action

■ Under the statutory scheme enacted under CERCLA, the type of action taken by EPA determines the statute of limitations for filing cost recovery actions. The Act provides in relevant part that,

An initial action for recovery of costs referred to in section 9607 of this title must be commenced—

(A) for a *removal action,* within 3 years after completion of the removal action, except that such a cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for a continued response action; and

(B) for a *remedial action,* within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

In any such action described in this subsection, the court shall enter a declaratory

judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.

42 U.S.C.A. § 9613(g)(2)(A) (West Supp. 1992) (emphasis added). The term "removal" is defined by 42 U.S.C. § 9601(23) in relevant part, to mean

the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

The term "remedial action" is defined by 42 U.S.C. § 9601(24) in relevant part, to mean

those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, on site treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

In the present action, there seems to be little doubt that EPA was engaged in a removal

rather than remedial action at the Church Rock site.

### 2. Policy Considerations

 The statute of limitations for CERCLA was added by Congress in 1986. Prior to this time, no statute of limitations existed. In interpreting this statute, courts have held that the application of the limitations period is to be prospective only, and does not affect cost recovery activities undertaken prior to 1986. *See United States v. Moore,* 698 F.Supp. 622, 625–26 (E.D.Va.1988)

We apply the time-honored principle that statutes, as opposed to judicial decisions, operate prospectively only unless legislative intent unequivocally appears to the contrary. Additionally, statutes of limitations sought to be applied to bar rights of the Government must be strictly construed in favor of the Government.... Contrary to defendants' contention, it is consistent with Congressional intent to apply CERCLA to pre-enactment acts but not to apply § 9613(g) retroactively.

*accord, United States v. Kramer,* 757 F.Supp. 397, 437 (D.N.J.1991). The limitations period for cost recovery actions based on activity prior to § 9613(g)'s passage begins to run on the effective date of that statute. *Id.* ("As to pre-existing claims, the three-year limitations period begins to run on the effective date of SARA's [Superfund Amendments and Reauthorization Act] enactment, October 17, 1986").

Courts have interpreted the statute of limitations liberally in favor of EPA. For example, in ruling on a party's right to bring suit on a lien imposed by EPA, the first circuit stated

This action may be brought several years after the notice of lien is filed; it is limited only by a rather complicated statute of limitations, *see* 42 U.S.C. § 9613(g)(2), which gives EPA three years after a removal action is completed or six years after a remedial action is commenced to bring such a suit. The running of the statute of limitations is entirely within EPA's control. Since the government may take its own sweet time before suing, and since the removal or remedial action may

itself take years to complete, the lien may be in place for a considerable time without an opportunity for a hearing.

*Paul D. Reardon v. United States,* 947 F.2d 1509, 1519 (1st Cir.1991).

### 3. Severability of EPA Response Actions

 United Nuclear contends that the three year statute of limitations started to run, at least against part of the actions taken by EPA, as early as 1983. This reasoning is contrary to the plain reading of the statute, and inconsistent with previous holdings on this issue.

Under the plain reading of the statute, the limitations period does not begin to run until "after completion of the removal action". *See* 42 U.S.C. § 9613(g)(2)(A). But, the definition of removal contained in the statute seems to contemplate a series of actions, rather than a discrete activity, as constituting a removal action. That is, the definition of "removal" encompasses "such *actions* as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such *actions* as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances". 42 U.S.C.A. § 9601(23) (emphasis added).

In general, courts have held that the statute of limitations does not begin to run until *all* of the actions taken by EPA are complete. These decisions do not make a distinction between separate actions. *See e.g., United States v. Rohm and Haas Co.,* 790 F.Supp. 1255, 1264–65 (E.D.Pa.1992),

> The limitations period begins to run as of the time when all contamination has been removed. However, "removal" is not confined to on-site removal.... Here, the complaint was filed on November 25, 1990, and the physical removal of contaminated soil by Rohm & Haas was completed in July 1987. Nevertheless, EPA did not propose to eliminate the site from the Superfund List until June 24, 1988. It was stipulated that EPA "continues to monitor, assess and evaluate the release and threat of release of hazardous substances and Rohm & Haas DVI's activities at the site." Even after this lawsuit was begun, it could

not be said that complete "removal" under CERCLA had occurred. Given these facts, the statute of limitations defense is unavailing.

(citations omitted); *United States v. R.A. Corbett Transport, Inc.,* 785 F.Supp. 81, 82 (E.D.Tex.1990) ("The Court finds, therefore, that *all* Site activities conducted by the United States, including the remedial investigation, were removal actions under the meaning of CERCLA.") (emphasis added). The courts have gone so far as to hold that the removal action is not complete until the record of decision has been issued by the EPA. *See e.g., United States v. Petersen Sand and Gravel, Inc.,* 1991 WL 296723, 3 (N.D.Ill. 1992)

> [T]he court concludes that the issuance of the record of decision is an integral part of the remedial investigation and feasibility study process. Consequently, the statute of limitations begins running when the remedial investigation and feasibility study removal action is completed by the EPA's issuance of its record of decision.

and *United States v. R.A. Corbett Transport, Inc.,* 785 F.Supp. at 82; *But see, Kelley v. E.I. duPont de Nemours,* 786 F.Supp. 1268, (E.D.Mich.1992)

> They [the plaintiffs] argue that removal was not complete until March 3, 1988, when the final RI and FS Reports were issued. The Court finds no merit in this March 3, 1988 completion of removal argument. There is no evidence of record to establish that after July 15, 1987 there were any more on-site clean-up or assessment activities taking place. Rather, the very exhibits that Plaintiffs submitted ... establish that the removal of five truckloads of contaminated soil and four drums of hazardous waste on July 15, 1987 was, as the Magistrate Judge found, the last removal activity on the Site.

In the instant case, EPA filed the cost recovery action on September 30, 1991. Contrary to United Nuclear's assertion, the very earliest that the statute of limitations could have started to run, absent further EPA activity, was October 17, 1986, when § 9613 became effective. However, EPA continued evaluation of the site, and did not

issue its record of decision until September 30, 1988, exactly three years prior to the filing of this action. In accord with the policy that statute of limitations are to be construed liberally in favor of the government, *see United States v. Mottolo,* 605 F.Supp. 898, 902 (D.N.H.1985), and the broad remunerative policies behind CERCLA, this Court finds that the statute of limitations did not begin to run until September 30, 1988, when the ROD was filed. Therefore, based on the three year statute of limitations applicable in this circumstance, the filing of the present action on September 30, 1991 was timely.

### B. Federally Authorized Release

The federally permitted release argument is not only a defense to the government's Motion for Partial Summary Judgment, but is also the basis for United Nuclear's Cross Motion for Summary Judgment. For purposes of this opinion, the Court will not distinguish between arguments made in defense of the government's Motion for Partial Summary Judgment and United Nuclear's arguments made in support of its Cross Motion for Summary Judgment.

### 1. Historical Development

When the Church Rock facility first came under EPA scrutiny, EPA was forced to file an action in the United States District Court for the District of New Mexico, in effort to compel United Nuclear to give EPA's investigators access to the facility. *See United States of America v. United Nuclear Corporation,* 610 F.Supp. 527 (D.N.M.1985). In response, United Nuclear filed a counterclaim seeking injunctive and declaratory relief against EPA. United Nuclear asked the District Court to declare that the remedial plan already imposed by United Nuclear was sufficient to remedy any contamination at the site, and that United Nuclear would not be liable for any funds expended by EPA. Additionally, United Nuclear asked that the court enjoin EPA from entering the Church Rock site because the site was being run pursuant to a state license issued under a delegation of authority from NRC.

In granting the United States' motion to dismiss the counterclaim, Judge Baldock determined that the court lacked jurisdiction under both CERCLA and the Administrative Procedure Act to review the decision of the EPA prior to the issuance of a final agency decision. In so holding, Judge Baldock did not reach the propriety of EPA's actions at the Church Rock facility, instead stating

> The defendant can raise as a defense in any future cost recovery action every objection to EPA's response activity which it could legitimately raise in a judicial proceeding at this time. Assuming that EPA elects to sue the defendant, it may only recover costs of removal or remedial action incurred by EPA not inconsistent with the National Contingency Plan. 42 U.S.C. § 9607(a)(4)(A).

*Id.* at 529. The present action constitutes the EPA cost recovery action contemplated in the 1985 proceeding. As noted above, EPA issued a record of decision in September of 1988, thereby providing a final agency determination which this Court can now review.

### 2. CERCLA Statutory Scheme

Under the CERCLA statutory scheme, only three actual defenses are permitted which preclude liability. *See* 42 U.S.C.A. § 9607(b) (West 1983),

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
>
> (1) Act of God;
>
> (2) an act of War;
>
> (3) an act or omission of a third party other than an employee or agent of the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omis-

sions of any such third party and the consequences that could forseeably result from such acts or omissions; or (4) any combination of the foregoing paragraphs.

In addition to these defenses, however, CERCLA provides several circumstances under which EPA cannot collect its response costs using the CERCLA scheme. One of these circumstances arises when the release occurred in conformity with a federally issued license. 42 U.S.C.A. § 9607(j) (West Supp.1992) provides that

> Recovery by any person (including the United States or any State or Indian tribe) for response costs or damages resulting from a federally permitted release shall be pursuant to existing law in lieu of this section. Nothing in this paragraph shall affect or modify in any way the obligations or liability of any person under any provision of State or Federal law, including common law, for damages, injury, or loss resulting from a release of any hazardous substance or for removal or remedial action or the costs of removal or remedial action of such hazardous substance. In addition, costs of response incurred by the Federal Government in connection with a discharge specified in section 9601(10)(B) or (C) of this title shall be recoverable in an action brought under section 1319(b) of Title 33.

The term federally permitted release is defined in the relevant part of 42 U.S.C.A. § 9601(10) to mean,

> (K) any release of source, special nuclear, or byproduct material, as those terms are defined in the Atomic Energy Act of 1954 [42 U.S.C.A. § 2011 et seq.], in compliance with a legally enforceable license, permit, regulation, or order issued pursuant to the Atomic Energy Act of 1954.

### 3. United Nuclear's Argument

 United Nuclear argues that the tailings seepage was authorized by the license issued by the New Mexico Environmental Improvement Division (NMEID), and therefore EPA should have to pursue remedies other than CERCLA to recover its expenditures. United Nuclear has submitted numerous affidavits in support of its motion for summary judgment. Many of these affiants are former employees of NMEID, who attest that NMEID knew of the seepage and that such seepage was authorized by the license. These affidavits are contradicted by affidavits submitted by the United States in support of its position. In addition, United Nuclear argues that given the prevailing practice in the industry at the time, NMEID should have known seepage would occur from the tailings ponds. Despite United Nuclear's numerous affidavits, it fails to point to any area of the license which, by its plain language, purports to permit the seepage of tailings liquid into the aquifers.

This Court finds that the license, though voluminous, is not ambiguous, and therefore that we need not resort to extrinsic evidence to interpret the document. Based on this Court's evaluation of the NMEID license, it is clear that NMEID knew of the seepage problem, but in no way authorized it to occur. The correspondence, and subsequent remedial action taken by United Nuclear under NMEID direction, was in response to the unexpected seepage, and can not be construed to authorize the discharge. In fact, all of the actions which NMEID ordered were taken in an effort to minimize the discharge and could not be interpreted, as United Nuclear asserts, to permit discharge in unlimited amounts.

A review of the language of the license indicates that both United Nuclear and NMEID initially anticipated very little, if any, seepage from the tailings pits. *See* License Application Supplemental Sheets 1975 at 5 ("Deep wells provide access to ground water which is not likely to become contaminated by proposed activities."). The NMEID continued to be concerned about the potential for seepage, and instructed United Nuclear to take steps to minimize seepage. *See* Letter from John G. Dudley, Environmental Scientist III to H. John Abbiss, Manager, Safety and Environmental Services, United Nuclear Corporation dated April 2, 1976.

> The Agency is very concerned about the plan to utilize zones lying in the interior portion of the tailings disposal pond as

borrow areas. Experience has shown that disturbing the native soil cover may result in induced seepage losses from surface impoundments with ground water contamination. On February 24 I discussed this matter with Mr. Swanquist at some length. It was resolved that borrowing from the interior portion of the starter dam could proceed with the clear understanding that United Nuclear Corporation is responsible for dealing, to the Agency's satisfaction, with any zones of permeable material that are exposed by the borrowing activities. It must be understood that this may involve the installation of pond lining material.... In addition to ground water monitoring, the Agency feels that a seepage detection monitoring system is appropriate at the tailings pond.

Furthermore, even after the parties agreed that a seepage monitoring program was appropriate, the tone of the correspondence reflected the presumption that seepage would not occur to any great degree. *See* Letter from H. John Abbiss, Director—Technical Services, United Nuclear Corporation to John Dudley, Water Quality Division dated June 28, 1976 ("We hereby agree that *should seepage reach the monitor sites* at any time up to two years after cessation of mill operations, it will be collected and disposed of in such a manner that it will not contaminate groundwater.") (emphasis added).

Indeed, even after it became clear that seepage was occurring, and a plan for monitoring the seepage was in place, United Nuclear continued to assert that seepage would be minimal. *See* Updated Church Rock Uranium Mill Environmental Report, submitted to NMEID on March 14, 1977 with transmittal letter from H. John Abbiss p. 3–17 ("Except for the very small quantity of liquid that will percolate into the ground, the tailings pond liquid will evaporate."); *See also, id.* p. 3–26

Water pumped from the mine tends to recharge alluvium. Seepage from the proposed tailings pond will have the same effect, although the volume will be much less. Permeability of approximately 0.01 ft/year is expected for liquid from the tail-

ings pond. Total infiltration should be only a few gal/min per acre after the pond has been operating a few years.

Once it became clear that seepage was occurring in much greater quantities than expected, NMEID ordered United Nuclear to determine the amount of seepage and to remedy the situation. *See* Order issued by Thomas E. Baca, Director, New Mexico Environmental Improvement Division, November 9, 1979

The company shall initiate a program to define the vertical and horizontal extent of seepage contamination in the Dilco Member and shall initiate an evaluation of alternatives to collect the seepage in accordance with paragraph 3 of the June 28, 1976 letter from John Abbiss to John Dudley which is incorporated by reference in the mill license.

The federally permitted release defense must fail because based on the four corners of the license this Court is unable to find any indication that the release of hazardous material was permitted. In fact, the documents contained in the license show that initially the NMEID contemplated seepage to be minimal, and that once seepage was found to be occurring, NMEID ordered United Nuclear to take steps to minimize seepage. Clearly there is no indication that the NMEID license was intended to permit seepage in unlimited quantities as United Nuclear would have this Court believe.

### IV. CONCLUSION

Based on the foregoing, the United States' Motion for Partial Summary Judgment on the Issue of Liability will be granted. Strict liability incurs for violations of CERCLA once the four part test described above has been satisfied. EPA has established each element of the four part test, and United Nuclear has failed to establish any of the three available defenses. Additionally, United Nuclear has failed to establish that the statute of limitations should bar this action, and has failed to show that the NMEID license permitted the release of hazardous substances, in unlimited amounts, from the tailings impoundments. For the above rea-

sons, this Court will also deny United Nuclear's Motion for Summary Judgment.

United Nuclear's remaining argument applies to the damages rather than the liability portion of this litigation. Whether EPA's expenditures were in accordance with the NCP is clearly an issue of fact. Any inconsistency with the NCP can be used to limit EPA's recovery during the damages portion of this action.

An order in accordance with this opinion shall be entered.